**Herman GROSS and Reuben E. Gross, Petitioners,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**No. 896, Docket 72–2229.**

United States Court of Appeals, Second Circuit.

Argued April 11, 1973.

Decided June 13, 1973.

Reuben E. Gross, Staten Island, N. Y., for petitioners.

Joseph A. Marino, Associate Gen. Counsel, FCC, Washington, D. C. (John W. Pettit, Gen. Counsel, and John E. Ingle, Counsel, FCC, Washington, D. C., on the brief), for respondent FCC.

Thomas E. Kauper, Asst. Atty. Gen., and George Edelstein, Atty., Dept. of Justice, Washington, D. C., for respondent United States.

Before SMITH, HAYS and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

The sole issue properly before us on this petition to review a newly promulgated regulation of the Federal Communications Commission, 47 C.F.R. § 97.114(c) (1972), which prohibits use of amateur radio station facilities for transmission of business communications, is whether the regulation violates the freedom of speech provision of the First Amendment and the anti-censorship provision of Section 326 of the Federal Communications Act, 47 U.S.C. § 326 (1970). We hold that it does not.

We deny the petition to review.

## I.

Petitioners Herman and Reuben E. Gross, holders of amateur radio station licenses, seek review of an FCC Report and Order, 37 Fed.Reg. 21997, to the extent that it promulgated Section 97.114 (c)[1] of a new FCC regulation, 47 C.F.R. § 97.114(c) (1972), effective December 1, 1972, which prohibits transmission of business messages for third parties in the Amateur Radio Service (ARS).[2] Promulgation of the new regulation followed standard rule making procedure prescribed by the Administrative Procedure Act, 5 U.S.C. § 553 (1970), including requirements as to notice and public participation.

The rule making proceedings that led to promulgation of Section 97.114(c) were initiated by a petition filed September 15, 1970 by the Amateur Radio Section, Industrial Electronics Division, Electronics Industries Association (the Association). The petition sought an amendment of former Section 97.39 of the FCC regulations, 47 C.F.R. § 97.39 (1972), which prohibited non-amateur organizations from holding an amateur station license and from using the facilities of amateur licensees.[3]

Despite the unambiguous language of Section 97.39, amateur stations had been used for communications on behalf of certain non-amateur organizations such as the Red Cross and March of Dimes. Such use went largely unchallenged because there was general agreement that such organizations were meritorious. Recently, however, there had been a pro-

---

1. Section 97.114(c) provides:
 "**Third Party Traffic**
 The transmission or delivery of the following amateur radiocommunication is prohibited:
 \* \* \*
 (c) Except for an emergency communication as defined in this Part, third party traffic consisting of business communications on behalf of any party. For the purpose of this section business communication shall mean any transmission or communication the purpose of which is to facilitate the regular business or commercial affairs of any party."

2. The Amateur Radio Service (ARS) has long been recognized by Congress, 47 U.S.C. § 153(q) (1970), by the FCC, 47 C.F.R. Part 97 (1972), and by our Court, Lafayette Radio Electronics Corp. v. United States, 345 F.2d ·278, 280 (2 Cir. 1965). Much of the highly developed radio communication technolo-

gy existing today is the result of advances and discoveries made by amateur radio enthusiasts during the past 70 years. They have provided service to the public in times of disaster and emergency. The FCC has allocated parts of the radio spectrum to the ARS. The FCC's regulatory scheme for the ARS uniformly has provided that its communications be noncommercial in nature and that only licensed amateur operators may obtain station licenses and use the facilities of amateur stations. These considerations provide the underpinning for the new regulation here under review.

3. Former Section 97.39 provided in relevant part:
 "An amateur station license will not be issued to a school, company, corporation, association, or other organization, nor for its use, . . . . "
 The only exception to this prohibition was for a "bona fide amateur organization or society." *Id.*

liferation of non-amateur organizations which sought to use amateur stations for less meritorious purposes. In response to requests for interpretation, the FCC denied use of the ARS on behalf of such meritorious organizations as the Eye Bank and the United Fund. This led to the Association's rule making petition, referred to above, in which the FCC was requested to amend its restrictions on third party traffic by permitting messages in assistance of certain enumerated "non-profit public service" organizations and activities.

A basic purpose of the FCC's rule making proceeding was to determine the kinds of organizations to be made eligible and the types of communications to be permitted. The FCC set forth the amendment proposed by the Association and requested comments and suggestions from all interested parties.

Among the 75 comments received, was one from petitioner Reuben E. Gross. By letter dated July 21, 1971, he contended that the FCC "has no power to censor or regulate the contents of communications unless the messages are anti-social in nature, i. e. criminal, libelous, inflammatory, obscene, etc."; that "[a]ny regulation therefore, whether by way of total proscription or limitation of content of messages, may be *ultra vires* this Commission"; and that the "proceeding should be dismissed on the ground that the content of messages of an innocent or meritorious nature are not a proper subject of censorship or regulation by [the] Commission."

The FCC, in its Report and Order, expressly rejected this contention by petitioner Gross and others:

"It has been established, however, that eligibility restrictions and reasonable rules limiting communications to those

consistent with the purpose of the radio service involved are within the scope of the Commission's authority. See, Lafayette Radio Electronics Corp. v. United States, 345 F.2d 278 (2nd Cir. 1965). Moreover, it is not only permissible but an affirmative duty of this Commission to classify radio stations and to regulate the nature of the radiocommunication service that is to be rendered by stations in that class. See § 303(a) and (b). Our rules adopted today regarding commercial third party traffic merely regulate generally the nature of the radio communication service which may be rendered by amateur stations." FCC Report and Order ¶6.

The upshot of the change reflected in Section 97.114(c) [4] was to effect a compromise between total prohibition of third party traffic and total allowance of third party traffic. The FCC recognized that total prohibition would be inconsistent with the expressed purpose of "[r]ecognition and enhancement of the value of the amateur service to the public as a voluntary noncommercial communication service." 47 C.F.R. § 97.-1(a) (1972). On the other hand, total allowance would produce unmanageable congestion in the amateur frequency bands. The solution adopted was to prohibit only commercial messages which had long been considered inappropriate in the ARS, although not expressly forbidden. As a result of the rule change, public service organizations such as the Eye Bank and American Red Cross are able to use ARS facilities except for communications which facilitate the regular business or commercial affairs of those organizations.

 With this background, we turn directly to the only issue properly before us on this petition to review.[5]

---

4. Petitioners here challenge only Section 97.114(c) of the new regulation which deals with third party commercial messages. They do not challenge Section 97.114(a) (international third party traffic) or Section 97.114(b) (prohibition of transmission of third party mes-

sages in return for direct or indirect compensation).

5. We have carefully examined the sundry other grounds upon which petitioners seek for the first time on the instant petition to review to challenge Section

## II.

■ Petitioners' free speech and anti-censorship claim essentially is that the FCC has violated the First Amendment and Section 326 of the Federal Communications Act, 47 U.S.C. § 326 (1970), by restricting, without sufficient justification, the content of transmissions from ARS stations.

At the outset, it should be noted that Section 303(a) and (b) of the Act, 47 U.S.C. § 303(a) and (b) (1970), authorizes the FCC to "[c]lassify radio stations" and to "[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within any class". Petitioners nevertheless contend that the FCC is prohibited from restricting the content of messages transmitted within a class of service. This contention ignores the stringent technological limits on the availability of radio frequencies.[6] As Justice Frankfurter succinctly described the problem thirty years ago:

"Freedom of utterance is abridged to many who wish to use the limited facilities of radio. Unlike other modes of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to government regulation. Because it cannot be used by all, some who wish to use it must be denied." National Broadcasting Co. v. United States, 319 U.S. 190, 226 (1943).

Since the early 1920's the demands for spectrum space always have exceeded the supply. As a result, it has been necessary to determine which uses of radio will be permitted, to allocate specific frequencies to such uses, and to prohibit transmissions over these frequencies clearly inconsistent with such uses. Public policy of course requires that such allocation and restriction be done on a rational basis. Congress has prescribed "public convenience, interest or necessity" as the applicable standard. 47 U.S.C. § 303. In the instant case, the issue before us involves the authority of the FCC to limit the content of transmissions over particular frequencies so that these frequencies can serve the public interest.

We have held that the FCC can prohibit a certain type of conversation over a particular frequency where the alternative would be to deny to many intended users any access to the frequency. Lafayette Radio Electronics Corp. v. United States, 345 F.2d 278 (2 Cir. 1965). In *Lafayette,* as here, a new FCC regulation was challenged on the ground that it violated the First Amendment and Section 326 of the Act. The regulation provided that a Citizens radio station shall not be used "[f]or engaging in radio communications as a hobby or diversion, i. e., operating the radio station as an activity in and of itself." Petitioners argued that, since a Citizens radio station is available to all citizens for personal and business activities generally, citizens must be permitted to say whatever they please. We rejected this claim. We pointed out that the Citizens Radio Service differs from broadcast

97.114(c). Clearly petitioners are barred by 47 U.S.C. § 405 (1970) from raising in this Court questions which were not raised before the Commission in the first instance or in a petition for reconsideration. See Cornell University v. United States and FCC, 427 F.2d 680, 684 (2 Cir. 1970); Conley Electronics Corp. v. FCC, 394 F.2d 620, 624 (10 Cir. 1968), cert. denied, 393 U.S. 858 (1968). This bar precluding judicial review of issues that the FCC has not had the initial opportunity to consider is not a mere technicality. It is grounded on sound policy reasons.

6. It is impossible, under existing technology, for two transmitters to emit signals from the same geographical point on the same frequency without interfering with one another. Moreover, the area of interference generally is broader than the area of beneficial use. A signal not strong enough to be useful nevertheless may be strong enough to interfere. A signal on a particular frequency does not confine itself to a precise point in the spectrum; its effects are felt on other frequencies in the vicinity. See Jones, Regulated Industries 1020–22 (1967).

and common carrier services in that frequencies must be shared because of the large number of users. We noted the great number of licensees using a small number of frequencies. We then held:

"Here is truly a situation where if everybody could say anything, many could say nothing. The very absence of restrictions on the number of users may demand more restrictions on the use. The Commission was thus empowered in the public interest to prohibit communications over the limited available frequencies which serve no purpose other than the sheer pleasure of emitting them and receiving a response or of discussing the equipment itself. There is likewise no force in the argument that, while banning discussion of radio equipment, the rule does not outlaw communications of no more social value, e. g., between licensees sharing a common interest in a sport, save when the station is operated 'as an activity in and of itself.' Experience had demonstrated that chit-chat about equipment was a characteristic of hobby type operation and was absorbing an undue amount of the time available on the limited frequencies of the Citizens Radio Service; prohibition of other uses of minimal utility may permissibly await demonstration of the need." 345 F.2d at 281.

See also California Citizens Band Association v. United States, 375 F.2d 43, 55 (9 Cir.), cert. denied, 389 U.S. 844 (1967), which adopted the reasoning of *Lafayette* in rejecting a similar challenge to the same regulation affecting the Citizens Radio Service.

■ We hold that petitioners' First Amendment and Section 326 claim in the instant case is foreclosed by our decision in *Lafayette*.[7] Section 97.114(c) prohibits the commercial use of ARS stations so that persons interested in developing radio arts and skills will have frequencies available to them. Like the Citizens Radio Service, and unlike the broadcast and common carrier services, ARS licensees must share the use of a limited number of frequencies. The FCC has here determined that commercial use of ARS stations would lead to such congestion of the limited frequencies that use for such universally beneficial purposes as advancing radio technology and providing emergency communications would be precluded:

"There can be no legitimate reason for an amateur station to carry message traffic of a commercial nature. Radiocommunications, the sole purpose of which is to facilitate regular business or commercial activities, do not enhance the intended purpose of the Amateur Service and should not be allowed except for an emergency communication as defined in our rules." FCC Report and Order ¶5.

And while the regulations permit the use of the ARS for non-commercial public service communications on behalf of such organizations as the Red Cross, there can be no serious doubt that such use has a higher social value than commercial use. Moreover, commercial use was certain to occupy an undue amount of the time available on the limited frequencies of the ARS, while public service use will be merely occasional.

7. Petitioners argue that *Lafayette* is distinguishable from the instant case. They contend that *Lafayette* merely indicates that the FCC can classify stations according to the technique of transmitting a message. Since amateur radio includes, for example, "directed" transmissions as well as "random" transmissions, while Citizens radio uses only directed transmissions, they say that the FCC properly prohibited amateur radio transmissions from Citizens radio stations. But, so the argument goes, since no technical difference exists between a commercial and noncommercial transmission from an ARS station, the FCC cannot prohibit one while allowing the other.

We are not persuaded by this argument. The thrust of our *Lafayette* decision is that the FCC can limit transmissions to certain frequencies according to the purpose and nature of the transmission, as well as according to the technique of transmission, so that the most beneficial use of the frequency can be made.

In short, here is a situation where a restriction has been imposed so that certain uses of radio, which over the past 70 years have proven to be invaluable to the radio industry and to humanity, will not be seriously impaired. The FCC was empowered in the public interest to prohibit communications from ARS stations which did not perform a valuable public service and which might seriously reduce the beneficial operations of the ARS.

We hold that Section 97.114(c) of the FCC regulations, in prohibiting commercial transmissions from ARS stations, does not violate the First Amendment or Section 326 of the Federal Communications Act.

Petition denied.