### UNITED STATES of America, Petitioner,

v.

### FEDERAL COMMUNICATIONS COMMISSION, Respondent,

American Telephone and Telegraph Company, United States Independent Telephone Association, Southern Pacific Communications Company, People's Counsel of Maryland, Intervenors.

No. 81–1751.

United States Court of Appeals, District of Columbia Circuit.

Argued May 5, 1982.

Decided May 13, 1983.

---

Marion L. Jetton, Atty., U.S. Dept. of Justice, Washington, D.C., with whom Barry Grossman and Robert B. Nicholson, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief, for petitioner.

John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Lisa B. Margolis, Counsel, F.C.C., Washington, D.C., were on the brief, for respondent.

Jules M. Perlberg, Chicago, Ill., with whom David J. Lewis, Alfred A. Green, New York City, and Robert B. Kunkel, Philadelphia, Pa., were on the brief, for intervenor, American Tel. and Tel. Co.

Thomas J. O'Reilly, Daniel J. Greenwald, III, and Shelley S. Sternad, Washington, D.C., were on the brief, for intervenor, U.S. Independent Telephone Ass'n.

Sandra Minch Hodes, Columbia, Md., entered an appearance for intervenor, Office of People's Counsel of Md.

Daniel A. Huber, Washington, D.C., entered an appearance for intervenor, Southern Pacific Communications Co.

Before MacKINNON and WILKEY, Circuit Judges, and HAROLD H. GREENE,* United States District Judge for the District of Columbia.

Opinion for the Court filed by District Judge HAROLD H. GREENE.

* Sitting by designation pursuant to Title 28 U.S.C. § 292(a).

**612**

HAROLD H. GREENE, District Judge:

In this petition for review of an order[1] of the Federal Communications Commission, the United States[2] challenges the rate of return set by the Commission for the interstate and foreign operations of the American Telephone and Telegraph Company.

In March 1979, AT & T, on its own behalf and on behalf of the Bell operating companies, filed with the Commission a petition requesting modification of the then authorized 9.5 percent rate of return. *In re AT & T,* 57 F.C.C.2d 960, 973 (1976). On May 7, 1981, following extensive proceedings, the Commission issued an order which fixed AT & T's overall rate of return at 12.75 percent. It is that order and that rate of return which are challenged in the instant proceeding. Specifically, the United States questions the methodology by which the Commission arrived at one of the elements it used in calculating the rate of return— the cost of the company's common equity. The Court concludes that the Commission's rationale is both discernible and reasonable, and it therefore affirms the agency's order.

**I**

The basic principles governing this type of case are well established. Regulated utilities are entitled to earn enough revenue not only to cover operating expenses but also to pay for the capital costs of doing business, including service on debt and dividends on stock. The return to the equity owner must be "sufficient to assure confidence in the financial integrity of the enterprise," *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944), in order that its credit may be maintained and capital may continue to be attracted.[3] The return should not be higher than necessary for this purpose, however, because otherwise ratepayers would pay the excessive prices that regulation is intended to prevent.[4] *Permian Basin Area Rate Cases,* 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1372–1373, 20 L.Ed.2d 312 (1968); *In re AT & T, supra,* 9 F.C.C.2d at 52; 47 U.S.C. §§ 201(b), 205(a).[5] Within this general framework, the Commission has broad discretion in selecting the appropriate methodology for calculating the rate of return. *FPC v. Hope Natural Gas Co., supra,* 320 U.S. at 602, 64 S.Ct. at 287; *Aeronautical Radio, Inc. v. FCC,* 642 F.2d 1221, 1228 (D.C.Cir.1980), *cert. denied,* 451 U.S. 920, 976, 101 S.Ct. 1998, 2059, 68 L.Ed.2d 311, 357 (1981).

The FCC employs a "weighted cost of capital" approach in calculating rates of return for carriers subject to its jurisdiction. *American Telephone & Telegraph Co.,* 86 F.C.C.2d 221, 224 (1981). The rate is a composite of the return on the two major components of the company's capital—debt and stockholders' equity, *Nader v. FCC,* 520 F.2d 182, 191 (D.C.Cir.1975), the elements of the calculation being the cost of debt, the cost of equity, and the proportion of each in the company's capital structure.[6]

AT & T's rate of return had last been set in 1976 at 9.5 to 10 percent, with the cost of equity being 12 percent. *AT & T,* 57 F.C.C.2d 960, 971–73 (1976). In March 1979, the

---

**1.** American Telephone and Telegraph Company, 86 F.C.C.2d 221 (1981), *reconsideration denied,* 87 F.C.C.2d 34 (1981).

**2.** The United States represents the consumer interests of the Department of Defense, the General Services Administration, and other federal executive agencies. *See United States v. ICC,* 337 U.S. 426, 430–32, 69 S.Ct. 1410, 1413–1414, 93 L.Ed. 1451 (1949).

**3.** Cost of capital "is just as real a cost as that paid for labor, material and supplies . . . ." In re AT & T, 9 F.C.C.2d 30, 51 (1967).

**4.** From the consumer's point of view, reasonable rates are those "which are as low as possible but still allow the industry to provide 'adequate and efficient service' . . . ." *Moss v. CAB,* 521 F.2d 298, 308 (D.C.Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976).

**5.** 47 U.S.C. §§ 201(b) and 205(a) require that rates must be "just and reasonable."

**6.** The FCC found that the following structure was to be used for calculating AT & T's average weighted cost of capital: common stock equity—.475522; preferred stock—.026459; debt—.480967; deferred credits, interest, and dividends—.017052.

company requested a change in the rate, citing alterations in economic conditions. In response to the petition, the Commission directed that an evidentiary hearing be held before an Administrative Law Judge. *Order Instituting Hearing,* 73 F.C.C.2d 689, 690 (1979). A number of witnesses were heard over a five-month period, and all the parties which actively participated in the hearing, including the United States, agreed that some increase in the rate of return was warranted.

In February 1981, the ALJ concluded that 10.87 percent constituted the appropriate rate of return for AT & T, the cost of the common stock equity component being 14.6 percent. *Initial Decision,* 86 F.C.C.2d 257, 281–82 (1981). Several parties, including AT & T and the United States, appealed to the full Commission. In its appeal AT & T claimed that its cost of capital had continued to rise while the proceedings were pending,[7] and that a market return on equity of 17.2 to 19.4 percent,[8] a book return of at least 17 percent, and an overall return of at least 13 percent were required under then current conditions. The Commission's trial staff agreed that the ALJ's recommendation was too low, and it suggested an overall rate of return of 11.5 percent.[9]

In its May 1981 decision, the Commission likewise indicated its agreement with the proposition that the figure recommended by the ALJ was too low. The Commission explained that the ALJ's calculations failed to take account of the higher price of more recent AT & T bond offerings and other indications that the cost of capital had risen since the initial record was compiled.[10] The Commission concluded that the cost of common equity under then current conditions was 17.4 percent, and that on this basis an overall rate of return of 12.75 percent was warranted. 86 F.C.C.2d at 251. The basic issue before the Court is whether the Commission adequately explained the methodology it employed to arrive at the new common equity figure.[11]

II

The Commission began with the undisputed premise that the cost of AT & T's equity will exceed the cost of its long-term debt.[12] See *Nader v. FCC, supra,* 520 F.2d at 241, 246. See also *Comsat v. FCC,* 611 F.2d 883, 899, 901–02 (D.C.Cir.1977). Next, the Commission attempted to determine the cost of the current long-term debt, and then the figure that, when added to that cost, would account for the greater risk associated with an equity investment.[13]

The most recent available information concerning the cost of AT & T's long-term debt was provided by a New Jersey Bell bond offering at 14.9 percent and a Pacific Telephone and Telegraph offering at 16.4 percent. In the exercise of its discretion,

7. AAA bonds had climbed to 14.89 percent in the first quarter of 1981.

8. AT & T argued that in view of market volatility and rising debt costs, a 5.6 to 6.6 percent risk premium should be added to the then prevailing yields of U.S. government bonds (11.6 to 12.8 percent).

9. The government made no specific complaint other than to except to the ALJ's characterization of the testimony of the government's expert as arbitrary.

10. The Commission believed that economic conditions generally—*e.g.,* the continued high level of inflation—and the financial status of AT & T in particular—*e.g.,* recent adverse price performance of AT & T common stock—warranted an updating of the witnesses' original recommendations.

11. In seeking review, the United States does not argue that a 12.75 percent rate of return is unreasonable but only that the Commission did not "rationally" explain its formulation of the cost of equity and that this element of the overall rate of return therefore was not the product of reasoned decision-making. The government adds, "the result may or may not be arbitrary, but this cannot be determined from the text of the decision." (Brief for Petitioner at 19.)

12. Debt is a lower risk investment and has a preferred claim on the company's earnings.

13. This summary of the Commission's framework is not the product of FCC counsel's *post hoc* description, as the United States argues in its reply brief, but is apparent from the record and the text of the Commission's decision. *See infra.*

the Commission chose the lower of the two figures as its reference point, a decision which is not here challenged. However, the United States does challenge the Commission's method of arriving at the increment by which the cost of AT & T's common stock equity should properly exceed the cost of the company's long-term debt.[14]

Several expert witnesses had assessed the cost of common equity before the ALJ, principal among them Virginia Dwyer, vice president and treasurer of AT & T, Irwin Friend, another AT & T witness; and Mark Langsam, an expert called by the United States. Ms. Dwyer concluded on the basis of her computations [15] that AT & T's book cost of common equity was in the range of 16.4 to 17.6 percent. 86 F.C.C.2d at 237. Dr. Friend testified that the cost of AT & T's equity was 16 percent; [16] and Mr. Langsam concluded that the proper return on AT & T's common stock equity would be in the range of 12.5 to 13.5 percent. The FCC criticized aspects of the testimony of each of these witnesses, but ultimately relying upon a synthesis of these expert opinions, it found that AT & T's cost of common equity was 17.4 percent.

The Commission concluded that Ms. Dwyer's assessment of an equity risk premi-um amounting to 5.6 to 6.6 percent over-stated the difference in risk between AT & T's bonds and AT & T's stock, referring specifically to the fact that the witness had compared industrial bonds with industrial stock without demonstrating that AT & T's stock carried the same risk as the industrial stocks in her sample.[17] However, in the Commission's opinion, Mr. Langsam's analysis compensated for this flaw since his "comparable earnings" approach sought to measure the very variable absent from Ms. Dwyer's analysis: the risk of AT & T stock compared with the risk of the stock of a composite of industrial corporations. On the basis of this testimony, the Commission was able to adjust downward Ms. Dwyer's risk premium to arrive at a risk premium tailored to AT & T. See *infra.* The ultimate 17.4 percent figure accepted by the Commission is composed of the cost of long term debt (14.9 percent) plus a risk factor amounting to 2.5 percent.[18] It is this computation that the government challenges.

The United States argues that the Commission's decision represents a failure of reasoned decision-making in that the agency failed adequately or rationally to explain its choice of 17.4 percent as AT & T's cost of equity. See *Bowman Transportation,*

14. The United States does not agree that this is the approach the FCC was consciously follow-ing, and it states in its reply brief that if this was the Commission's approach, it was illogi-cal.

15. Ms. Dwyer made appropriate adjustments for flotation costs, market pressure, and mar-ket break experience that constitute the differ-ence between the market cost of equity and the book cost of equity.

16. Dr. Friend, like several other witnesses, con-ducted a DCF ("discounted cash flow") study. Such an analysis can be reduced to a formula in which the cost of common stock equity is equal to the sum of (1) the anticipated dividend yield (current dividends divided by current market price) plus (2) the expected dividend growth rate. Dr. Friend surveyed the opinions of large institutional investors, and he conclud-ed that AT & T's common stock showed a dividend growth rate of 5.71 percent and that the average dividend yield was 9.62 percent, for an overall cost of common equity of 15.33 per-cent. He determined that adjusted for "under-pricing" (effects of market pressure, costs of

flotation, and underwriting expenses), the cost of book equity was 16 percent. Dr. Friend verified his estimates by computing the cost of equity of companies presenting a risk compara-ble to AT & T's—22 electric utilities which had a cost of equity of 15.2 percent and 23 compa-rable industrial companies which had a cost of equity of 15.4 percent.

17. The Commission expressly accepted the statement of another witness (Langsam) that "there is no firm, or group of firms, comparable to AT & T and the Bell Telephone System," and his conclusion that "industrial firms [cannot] 'be considered comparable to the Bell Tele-phone System.'" 86 F.C.C.2d at 246–47.

18. The Commission's trial staff had recom-mended an allowance for underpricing of .1 percent and the Commission agreed that "a slight upward adjustment to AT & T's market cost of common stock is appropriate." 86 F.C.C.2d at 46–47. It is thus likely that the risk premium was actually in the neighborhood of 2.4 percent.

*Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). See also *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *Nader v. FCC, supra,* 520 F.2d at 192–3. There appear to be two facets to the government's argument: (1) although the Commission explicitly rejected the methodology of each of the expert witnesses, it nevertheless relied upon their testimony in combination to arrive at the ultimate conclusion, and (2) it is not possible from the Commission's written decision to ascertain precisely what factors went into that decision. Neither of these criticisms is well taken.

■ The Commission was not required to accept any particular methodology. *Permian Basin Area Rate Cases, supra,* 390 U.S. at 800, 88 S.Ct. at 1377; *FPC v. Hope Natural Gas Co., supra,* 320 U.S. at 602, 64 S.Ct. at 287; *Comsat v. FCC, supra,* 611 F.2d at 898–99. To the contrary, it had the authority to adopt, and it was fully justified in this case in adopting, those portions of each witness' testimony that it found credible. *Nader v. FCC, supra,* 520 F.2d at 192–94.[19]

■ In the key paragraph of its decision, the Commission first postulated a current long-term debt cost of 14.9 percent—a finding not disputed by anyone—and it then went on to discuss the figure which, when added to that percentage, would yield the proper cost of equity. As noted, in order to arrive at the appropriate figure, the Commission drew on the analyses of both Ms. Dwyer and Mr. Langsam.

Ms. Dwyer compared the return on the stocks of industrial and other companies widely held by institutional investors with the return on the corporate bonds issued by such enterprises, and she concluded that a risk premium of 5.6 to 6.6 percentage points in favor of return on equity was appropriate. When Ms. Dwyer performed her study, the yield on corporate bonds was 9.5 to 10.5 percent. Had the Commission fully accepted her analysis without taking heed of AT & T's more recent bond cost of 14.9 percent, it would have set AT & T's cost of common equity at between 16.4 and 17.6 percent.[20] Substituting the higher 14.9 figure for the industrial bond yields, her risk premium would have dictated a cost of equity of 20.5 to 21.5 percent. However, the Commission decided that it could not fully rely on Ms. Dwyer's risk premium figures because AT & T, unlike all the companies in Ms. Dwyer's analysis, is not an industrial enterprise. It is, however, implicit in the Commission's decision that the industrial equity-industrial debt comparison provides a useful barometer of the risk differential between equity and debt in general and between AT & T's equity and debt in particular.[21]

In order to sharpen the comparison and render it more directly applicable to AT & T's situation, the Commission considered

---

19. The government states that the Commission rejected both Ms. Dwyer's and Mr. Langsam's methodology. That is not entirely accurate. The FCC did reject Ms. Dwyer's implicit assumption that a comparison between industrial equity and industrial debt would *ipso facto* yield the proper figure for the differential between AT & T's equity and AT & T's debt, and it stated that it could "not assign *conclusive* weight" to Ms. Dwyer's estimates in view of the evidence that AT & T is less risky than the industrials used in Ms. Dwyer's analysis. 86 F.C.C.2d at 241. The Commission did not reject, but relied upon, Ms. Dwyer's comparison as constituting one of several indices of the appropriate determination of AT & T's equity return. Similarly, the Commission did not re-

ject Mr. Langsam's analysis but stated only that it could not "fully" accept his result based solely on comparable earnings and disregarding the relationship between debt and equity. 86 F.C.C.2d at 245.

20. This figure includes an adjustment for underpricing. In her own DCF analysis, Ms. Dwyer also arrived at an estimate of 16.4 to 17.6 percent.

21. In the opening pages of its decision, in fact, the Commission noted that finding the risk differential between stock and debt was the "paramount" factor in determining the cost of AT & T's equity. 86 F.C.C.2d at 224.

the analysis of Mr. Langsam—the government's own witness—as an appropriate corrective. That witness had made a comparison between the return on AT & T's stock and the return on a group of industrial stocks. His investigation showed that the industrial stocks earned in the range of 15 to 17 percent, and he concluded that, since AT & T's stock was more stable, a reduction of between 2.5 and 3.5 from the rate of return on industrial equity was indicated, so as "to allow for the reduced risk which AT & T experiences when compared with required returns for industrial stocks." 86 F.C.C.2d at 246–47. On this basis, the Commission deflated Ms. Dwyer's risk premium figures of 5.6 to 6.6 percent [22] by the amount of Mr. Langsam's adjustment factor to account for AT & T's lesser risk when compared to industrial enterprises. This reduction yielded a range of 2.1 to 4.1 percentage points as the appropriate add-on to the cost of debt of 14.9 percent.[23]

Finally, the Commission selected a figure in the lower part of this zone (see *Nader v. FCC, supra,* 520 F.2d at 192)—as was within its discretion—ultimately adding a risk premium of 2.5 percent to the original 14.9 percent reference point [24] to arrive at a cost of common equity of 17.4 percent.

The Commission's explanation, it is true, is somewhat cryptic. The crux of its justification for the 17.4 figure may be found in the following paragraph:

> We will proceed under the premise that AT & T's cost of common stock equity must exceed the 14.9% effective yield on the 'AAA' rated New Jersey Bell Telephone Company forty year debt issue. Miss Dwyer calculated risk premiums on *industrial* stocks which varied from 5.7 to 6.6 percentage points.[25] (A.T. & T. Ex. 7, pp. 26–27.) Mr. Langsam, on the other hand, correctly noted that '(T)here is no firm, or group of firms, comparable to AT & T and the Bell Telephone System,' nor can industrial firms 'be considered comparable to the Bell Telephone System.' (F.E.A. Ex. 1, p. 17.) (Emphasis in the original) To account for this difference, Mr. Langsam adjusted his estimate of the required return for A.T. & T.'s common stock by 2.5% to 3.5% to allow for the reduced risk which A.T. & T. experiences when compared with required returns for industrial stocks. (*Id.* at 45–46.) After having considered this conflicting testimony in addition to the testimony of all of the witnesses in this proceeding and the updated evidence which was provided during oral argument, we have concluded that A.T. & T.'s cost of common stock equity is 17.4 percent. As we stated at the time of our decision in Docket No. 20376:
>
> ... no one method can be determinative of the appropriate return on Bell's equity capital. In the final analysis, we must apply our informed judgment to the range of estimates which we have found to be helpful indicators of the cost of equity. 57 F.C.C.2d 960, 972 (1976).

86 F.C.C.2d at 246–47.

It would no doubt have been preferable had the Commission made absolutely plain

---

**22.** These figures, as noted above, reflect the added risk of industrial equity over industrial debt.

**23.** A subtraction of Mr. Langsam's higher figure (3.5) from Ms. Dwyer's lower figure (5.6) and his lower figure (2.5) from her higher one (6.6).

**24.** The United States speculates that perhaps the Commission used the figure of 2.5 percent because it is in the lower range of the 2.5 to 3.5 differential, as computed by Langsam, between AT & T's riskiness and the riskiness of industrial stocks. (Brief for Petitioner at 17–18.) To posit that the Commission arrived at 17.4 percent by adding this 2.5 figure to the 14.9 per-

cent figure would be to assume an ignorance on the part of the Commission of the difference between stocks and bonds. Anyone cognizant of this difference would have known that the difference between AT & T's rate of return and the selected industrials' rate of return could not logically have been factored into a calculus which had as its starting point AT & T's bond cost (14.9) until it had first been run through an equation comparing bond and equity costs.

**25.** The 5.7 figure in this passage appears to be a typographical error since at several points earlier in the decision, the Commission used 5.6 instead. See, *e.g.,* 86 F.C.C.2d at 237, 241.

its reasoning that, based on the Langsam findings, 2.5 to 3.5 percent was to be subtracted from the Dwyer incremental risk figures (5.6 to 6.6)[26] and a figure in the resulting range was to be added to the going cost of AT & T's debt, so as to arrive at the cost of AT & T's equity.[27] In view of the considerations which the Commission did provide, it is difficult to accept the government's claim that "it is impossible rationally to discern the agency's course in reaching its decision" (Brief for Petitioner at 18). Actually, it would not be possible reasonably to arrive at the ultimate 17.4 figure other than by the computation described above.

The Commission essentially engaged in a triangulation exercise. The Commission knew the general contours of the relationship between debt and equity: equity requires a higher return because it is the riskier of the two. The Commission knew the going cost of debt but it did not know how much higher the equity return would have to be. It did know this variable with respect to industrial companies, however, thanks to Ms. Dwyer's analysis. Far from proceeding illogically, as the government contends, the Commission concluded that by reducing the differential between returns on industrial debt and industrial equity by the amount by which the riskiness of AT & T's equity differs from the riskiness of industrial equity, it would arrive at a reasonable computation of the unknown variable, the differential between the rate of return on AT & T's debt and AT & T's equity. To be sure, this method is not absolutely foolproof: in fact the cost of AT & T's equity could differ from AT & T's debt by an

**26.** The government's objection in one sense may be reduced to a complaint that the Commission did not explicitly perform the mathematical computation of subtracting Mr. Langsam's comparable earnings factor from Ms. Dwyer's risk premium range, and that it did not expressly state why it selected 2.5 percent from the resulting range of 2.2 to 4.1 percent. It is abundantly clear from the FCC decision, however, that these two steps were the only means by which the agency could have arrived at the 2.5 percent risk premium which, when added to the 14.9 percent basic debt figure, yielded the ultimate cost of common stock equity of 17.4 percent.

**27.** Contrary to the government's suggestion, the FCC did not simply use the various figures without offering an explanation of their significance. Thus, the Commission said in its decision:

> We have previously found that financial structure affects the overall rate of return, with respect to the proportions of debt and equity. The mix of debt and equity may affect the risk and consequently, the cost or return of each of those components.
>
> .    .    .    .    .
>
> Miss Dwyer developed a risk premium that ranged from 5.6 to 6.6 percent above the yield of bonds. Adding these premiums to the yields of Government bonds, occurring during the period from October, 1980, through January, 1981, of 11.6 to 12.8 percent resulted in a required market return on equity of 17.2 to 19.4 percent. The key element in the risk premium analysis is the estimate of the risk premium itself. Miss Dwyer utilized two groups of *industrial* stocks to make this determination. However, Miss Dwyer does not show the correlation, if one existed, between the risk premiums of the industrials and A.T. & T. Without that line we can not assign conclusive weight to Miss Dwyer's estimates of the cost of equity using the risk premium method. There is evidence in the record suggesting that A.T. & T. is less risky than the industrials utilized in Miss Dwyer's analysis which would have the effect of reducing the risk premium, and concomitantly the return on equity which is proposed.
>
> .    .    .    .    .
>
> In a comparable earnings study, Mr. Langsam found that the common stocks of industrial firms were achieving a return of 15 to 17 percent which Mr. Langsam then reduced by 2.5 to 3.5 percent to arrive at his estimate of the required return on common stock equity for A.T. & T. The Administrative Law Judge found that the 2.5%–3.5% differential was not based upon any quantitative study and 'appears to be wholly judgmental, indeed, simply arbitrary.' The Federal Executive Agencies, in their sole exception to the *Initial Decision,* objected to the characterization of Mr. Langsam's testimony as 'arbitrary,' and correctly noted, in our view, that Mr. Langsam's recommendation represents his judgment as an expert witness of the cost of common stock differential between A.T. & T. and industrial companies. Although we are not persuaded that Mr. Langsam's overall assessment of A.T. & T.'s cost of equity capital is correct, we would not characterize Mr. Langsam's judgment in that regard as 'arbitrary,' . . . .

86 F.C.C.2d at 224, 241, 245 (footnote omitted).

amount greater or lesser than these computations would suggest. But certainly, and particularly in view of the uniqueness of AT & T for these purposes and the government's failure to suggest a more perfect method (see note 34 *infra*), the analysis employed by the FCC was a reasonable one.

### III

There are three additional, more general reasons why failure to describe precisely all of the steps of the computation is not fatal.

First. Under settled law, the Commission may employ any formula or combination of formulas it wishes and it is free to make pragmatic adjustments called for by particular circumstances. *Permian Basin Area Rate Cases, supra*, 390 U.S. at 800, 88 S.Ct. at 1377; *Aeronautical Radio, Inc. v. FCC, supra*, 642 F.2d at 1228. Moreover, ratemaking is not an exact science;[28] "neither law nor economics has yet devised generally accepted standards for the evaluation of ratemaking orders;"[29] and rate of return decisions are appropriately treated as policy determinations in which the agency is acknowledged to have expertise.[30] Indeed, *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra*, 419 U.S. at 285–86, 95 S.Ct. at 441–442, teaches that a court should uphold "a decision of less than ideal clarity if the agency's path may be reasonably discerned." See also *Colorado Interstate Gas Co. v. FPC*, 324

U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945); *WAIT Radio v. FPC*, 418 F.2d 1153, 1156–57 (D.C.Cir.1969).

This Court has stated that it will "uphold the Commission's decision if, upon consideration of the entire record, the agency's rationale reasonably may be perceived." *Nader v. FCC*, 520 F.2d at 193. Even if the agency has not been "fastidious" in explaining its choice of the authorized rate of return (*id.* at 192), that choice will be upheld if the figure is "readily justifiable" on the basis of the Commission's entire opinion. *Id.* at 194. Clearly, the decision of the FCC in this case meets that less than exacting standard.

Second. The reasonableness of 2.5 percent as a risk differential between equity and debt is shown by a comparison with other, earlier cases. In 1967, the Commission allowed a premium of 3 to 4 percentage points over Bell's then current cost of long-term debt;[31] in 1972, it allowed a risk premium of 3.25 to 4.5 percentage points over current costs of long-term debt;[32] and in 1976 it allowed a risk premium of 3.0 to 3.25 percentage points over current long-term debt.[33] Moreover, even the 14.9 percent reference point may have been conservative, for the yield on the New Jersey Bell debt issue was at the time the lowest yield within the Bell System. In short, the Commission's decision passes any test of intrinsic reasonableness.[34]

**28.** *Association of American Publishers, Inc. v. Governors of the United States Postal Service*, 485 F.2d 768, 773 (D.C.Cir.1973).

**29.** *Permian Basin Area Rate Cases, supra*, 390 U.S. at 790, 88 S.Ct. at 1372.

**30.** *Sun Oil Co. v. FPC*, 445 F.2d 764, 767 (D.C. Cir.1971).

**31.** Brief of AT & T at 34.

**32.** *See* AT & T, 38 F.C.C.2d 213, 231–41 (1972).

**33.** *See* AT & T, 57 F.C.C.2d at 972, 974.

**34.** It may be noted that the government has failed, even in this Court, to propose any alternative figure for the cost of AT & T's equity, or any method other than the one used by the Commission for calculating that cost. In view of the fact that AT & T is unique and not

directly comparable with any other company or group of companies, the method of arriving at an estimate through comparisons between industrial debt and industrial stock, on the one hand, and industrial stock and AT & T stock, on the other, is preferable to a method that looks only at one or the other comparison. A comparison limited to stocks may give inadequate weight to variable bond costs while a comparison limited to bonds and stocks may give inadequate weight to variable stock costs. In this case, it is apparent that Mr. Langsam's stock-only analysis, producing a result of 12.5 to 13.5, did not take into account the particularly high cost of AT & T's bonds, while Ms. Dwyer's analysis failed to take account of the low risk of AT & T stock. The Commission acted reasonably in concluding that the truth lay somewhere in between.

Third. The government is not without responsibility for the failure of the Commission to explicate its decision more fully. On June 12, 1981, the FCC requested comments on a number of informal communications it had received objecting to the new rate of return.[35] Among the parties that responded were the federal agencies. But significantly, although these agencies requested that the new rates be phased in over a two-year period, they did not in any way challenge the reasonableness of the overall rate of return or the cost of equity component.

Under Section 405 of the Communications Act, 47 U.S.C. § 405, a party may not obtain judicial review of an FCC order without having requested rehearing when the party "relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass." The government here claims that the Commission's reasoning (but not necessarily the result it reached) is unsubstantiated. Although there was only informal correspondence following the May decision, the Commission treated the letters it received at that time as petitions for rehearing and invited comments thereon on that basis. The executive agencies did comment in response to that invitation, but they did not in their response raise any argument even resembling the one made here.[36] Had the

government brought what it now contends to be a failure to provide a full explanation to the Commission's attention, the Commission could easily have elaborated to cure any defect.

This case thus bears considerable resemblance to *Rogers Radio v. FCC,* 593 F.2d 1225, at 1230 (D.C.Cir.1978), where the Court stated that in the absence of "a showing of particular cause and sufficient justification" for failure to present an argument to the Commission first, there was no reason for the Court "to review this alleged error when the Commission was given no opportunity for its correction." See also, *Alianza Federal de Mercedes v. FCC,* 539 F.2d 732, 739 (D.C.Cir.1976); *Bilingual Bicultural Coalition v. FCC,* 595 F.2d 621, 632–33 (D.C.Cir.1978); *Neckritz v. FCC,* 502 F.2d 411, 417 (D.C.Cir.1974); *Gross v. FCC,* 480 F.2d 1288, 1290–91 n. 5 (D.C.Cir.1973).

For the reasons stated, the order of the Commission is

*Affirmed.*

---

**35.** "Comments Sought on Informal Requests for Reconsideration of AT & T Rate of Return Decision (CC Docket No. 79–63)," Public Notice of June 12, 1981.

**36.** Indeed, the government's arguments assumed that the Commission's decision was correct both in result and in reasoning, and it proposed only that, in the exercise of its discretion, the Commission should implement the rate increase gradually.