**BELLSOUTH MOBILITY, INC. Plaintiff**

v.

**MIAMI–DADE COUNTY, Florida Defendant**

**No. 98–2724CIVJORDAN.**

United States District Court,
S.D. Florida,
Miami Division.

March 30, 2001.

Jamie Cole, Ft. Lauderdale, Fl, for plaintiff.

Augusto Maxwell, Miami, FL, for defendant.

ORDER DENYING BELLSOUTH'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING MIAMI–DADE COUNTY'S CROSS-MOTION FOR SUMMARY JUDGMENT

JORDAN, District Judge.

BellSouth Mobility filed suit against Miami–Dade County seeking declaratory and injunctive relief for the County's al-leged violations of the Telecommunications Act of 1996, 47 U.S.C. § 151, et seq., and 42 U.S.C. § 1983. Jurisdiction is proper under 47 U.S.C. § 332(c)(7)(B)(v) and 28 U.S.C. § 1331. BellSouth moved for partial summary judgment, arguing that the County's denial of its application for an unusual use exception was not supported by substantial evidence, and hence must be reversed. Miami–Dade County cross moved for summary judgment on the same issue. The parties stipulated to the voluntary dismissal of BellSouth's § 1983 claim. See Notice of Stipulated Voluntary Dismissal of Count II [D.E. 41] (Feb. 17, 2000). Oral argument was held on February 23, 2000. For the reasons set forth below, BellSouth's motion for partial summary judgment [D.E. 39] is DENIED, and Miami–Dade County's cross-motion for summary judgment [D.E. 38] is GRANTED.

I. THE SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A material fact is one that might affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220, 1225 (11th Cir.1999).

II. THE FACTUAL BACKGROUND

The essential facts underlying this case are not in dispute. BellSouth is a wireless services telecommunications provider au-

thorized by the Federal Communications Commission to operate a personal wireless communications system throughout south Florida. In accordance with the terms of its licensing agreement, BellSouth is required to provide uniform services to all of its customers throughout a service area. In order to ensure uniform service, Bell-South constructs and maintains a network of cellular facilities.

BellSouth maintains that a service "gap" exists in the area of the proposed service facility, specifically the area of N.W. 183rd Street (Miami Gardens Drive) and 8th Avenue, an unincorporated area of the County. The service gap prevents BellSouth from providing its customers with clear reception and uninhibited service. In order to alleviate any system disuniformity, BellSouth proposed to install a wireless service facility in the area to prevent system overloads in the surrounding service areas. BellSouth engineers identified a suitable commercial site at 838 N.W. 183rd Street. The subject property is zoned BU–2, which is designated as "Business–Special," and is occupied by a small retail shopping center. *See* Motion for Partial Summary Judgment at Exh. R [D.E. 39] (Jan 13, 2001). The property to the north is also zoned BU–2, and is occupied by a commercial establishment; the property to the east is zoned BU–2 and is occupied by a shopping center; the property to the south is zoned RU–1 (Residential), and is occupied by single family residences; and the property to the west is zoned BU–2 & RU–1, and is occupied by commercial establishments and single family residences. *See id.* at Exh. R.

BellSouth obtained the consent of the property owner, and submitted an application for a public hearing to determine whether it could install a cellular communications facility at the site. The proposed facility would consist of a 90 foot monopole, antennas, and a 468 square-foot single story concrete block structure at the base of the monopole.[1] BellSouth filed the application in the name of the landowner of the proposed site, who agreed to lease a portion of the site for construction and maintenance of the proposed facility. BellSouth was named as a lessee. Under the County's zoning code, the facility constitutes an "unusual use" which must be reviewed by County officials and departments, and also must be approved by a community zoning appeals board.

All of the County officials who reviewed the application and site plan either approved the facility with or without standard conditions, or had no objection to the plan. More specifically, the Director of Planning, Development, and Regulation issued a written analysis of the proposed plan and recommended approval with some customary conditions. The Acting Assistant Director for Zoning also issued a written opinion also recommending approval subject to customary conditions. The remainder of the departments, including Environmental Resource Management, Public Works, Solid Waste Management, Fire, Fire Rescue, Park and Recreation, and Transit, had no objections to the application. *See* Motion for Partial Summary Judgment at Exh. at H–P.

After the staff recommendations were formalized, the County scheduled a public hearing before the community zoning appeals board (No. 3), which has jurisdiction over unusual use applications involving the proposed area. The zoning code mandates

---

1. "A monopole is a telecommunications tower used to transmit wireless telephone signals. Ordinarily, ... [telecommunications service providers] site[ ] [their] transmitters on existing structures. In such locations, the trans-mitters are almost invisible. Where no suitable pre-existing structures are available, a tower is built." *Omnipoint Corp. v. Zoning Hearing Board of Pine Grove Township*, 181 F.3d 403, 406 n. 2 (3d Cir.1999).

that the board take into consideration the staff's written recommendations and render a decision based upon the following standard:

> **Special exceptions, unusual and new uses.** Hear application for and grant or deny special exceptions; that is, those exceptions permitted by the regulations only upon approval after public hearing, new uses and unusual uses which by the regulations are only permitted upon approval after public hearing; provided the applied for exception or use, including exception for site or plot plan approval, in the opinion of the Community Zoning Appeals Board, would not have an unfavorable effect on the economy of Miami–Dade County, Florida, would not generate or result in excessive noise or traffic, cause undue or excessive burden on public facilities, including water, sewer, solid waste disposal, recreation, transportation, streets, roads, highways or other such facilities ..., are accessible by private or public roads, streets or highways, tend to create a fire or other equally or greater dangerous hazards, or provoke excessive overcrowding or concentration of people or population, *when considering the necessity for and reasonableness of such applied for exception or use in relation to the present and future development of the area concerned and the compatibility of the applied for exception or use with such area and its development.*

MIAMI–DADE COUNTY CODE § 33–311(A)(3) (emphasis added), Motion for Partial Summary Judgment at Exh. Q.

Prior to the public hearing, each board member received an application packet, which included staff recommendations, a site plan, past board action on the application, enforcement history, and disclosure of interest forms.

The first public hearing was held on June 11, 1998. At the hearing, a Bell-South representative was placed under oath, and testified that the proposed site would be favorable under each of the aforementioned criteria. The BellSouth representative explained that the proposed facility was necessary because it would eliminate a coverage gap and would relieve nearby facilities of excessive cellular traffic. At the hearing, one citizen spoke in favor of the application, and none spoke against it. One board member, Anita Pittman, asked whether BellSouth would create job opportunities in exchange for approval. Ms. Pittman further reiterated some concerns expressed to her regarding the possible health effects caused by exposure to the placing of the pole. The board was cautioned that the County attorney had already advised them not to discuss the health issues. Another board member, Charles Scott, inquired whether BellSouth could change the proposed facility from a standard monopole to a state of the art "stealth" monopole, which resembles a tree. After the BellSouth representative stated that he did not have the authority to agree to the design change, Mr. Scott moved to deny the application. BellSouth obtained a continuance of the hearing to determine whether or not a stealth monopole would be a viable option.

The Board conducted a second hearing on August 13, 1998. BellSouth notified the Board that it would change the design to a tree monopole. The proposed facility would be the first in Miami–Dade County, and would be approximately ⅛ shorter than a 125 foot tree monopole located in Coral Springs. The BellSouth representative submitted into the record diagrams indicating the location of the coverage gap, an affidavit by an engineer pertaining to structural integrity, and an independent real estate appraiser's study (which concluded that the construction of a monopole did not lower property values in any of the three prior areas where monopoles were constructed). Additionally, several citi-

zens spoke in opposition to BellSouth proposed plan, citing health concerns, racial issues, property value considerations, necessity issues, compatibility doubts, and safety concerns. Mr. Scott recommended that BellSouth meet with the neighbors of the proposed site. The hearing was adjourned until September of 1998.

At the third hearing held on September 3, 1998, a BellSouth representative brought along two BellSouth engineers and a real estate appraiser to the meeting. BellSouth submitted additional items into evidence, including a real estate appraisal report. The report concluded that the proposed monopole would not have an effect on property values. The BellSouth representative also introduced nine photographs of tall poles which already surround the site. In light of an erroneously dated hearing notice and the apparently low turnout of local citizens, the board voted to adjourn the hearing one more time.

On October 15, 1998, the board conducted the fourth and final hearing on BellSouth's application. During the citizens' comments, the County attorney again reminded the board not to consider any health effects, as mandated by the Telecommunications Act. One citizen spoke in favor of the application, while several spoke against it. The citizens speaking against the project cited aesthetics, lack of benefit to the community (i.e. no new jobs), detriment to property values, safety concerns, and health effects. In response, BellSouth's experts noted that the monopole could not be constructed on a tall building because none were located nearby, that the monopole would protect nearby buildings from lightning strikes, and that property values would be unaffected by the construction of the monopole. Several board members expressed their concerns about the project, including aesthetics and safety concerns, and at least one board member alluded to long term health concerns.

The board then voted to deny the application in a 5–1 vote. BellSouth was sent a resolution denying the application. The denial stated:

> [U]pon due and proper consideration having been given to the matter it is the opinion of this Board that the requested unusual use would not be compatible with the area and its development and would not conform with the requirements and intent of the Zoning Procedure Ordinance, and would have an adverse impact upon the public interest, and should be denied.

Motion for Partial Summary Judgment at Exh. Z.

### III. THE TELECOMMUNICATIONS ACT OF 1996

The Telecommunications Act of 1996 "is an omnibus overhaul of the federal regulation of communications companies," *Cellular Telephone Company v. Town of Oyster Bay,* 166 F.3d 490, 493 (2d Cir. 1999). However, the Act preserves the underlying contours of a state's zoning laws. *See Aegerter v. City of Delafield,* 174 F.3d 886, 891 (7th Cir.1999) ("Nothing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and we note that aesthetic harmony is a prominent goal underlying almost every such code."). The Telecommunications Act provides, in pertinent part:

> (7) Preservation of local authority
> > (A) General authority
> > Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof-

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

47 U.S.C. § 332.

 As noted in the express language of the Telecommunications Act, local zoning laws govern the siting of wireless facilities. *See Oyster Bay,* 166 F.3d at 494 ("[T]he TCA does not 'affect or encroach upon the substantive standards to be applied under established principles of state and local law.' ") (citation omitted). Such local zoning decisions, however, are subject to judicial oversight. *See id.* at 493 ("Although Congress explicitly preserved local zoning authority in all other respects over the siting of wireless facilities ... the method by which siting decision are made is now subject to judicial oversight. Therefore, denials subject to the TCA are reviewed by this court more closely than standard local zoning decisions.") (citations omitted). In order to sustain a local zoning agency's siting determination under the Telecommunications Act, the decision must be supported by substantial evidence. *See id.* at 494. This standard of review is deferential, and has been construed to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *De Groot v. Sheffield,* 95 So.2d 912, 916 (Fla.1957).[2] In reviewing the County's decision, I must

---

**2.** The County contends that the standard of "substantial evidence" under the Telecommunications Act may be lower than it is under state law. *See* Cross–Motion for Summary Judgment at Exh.3 [D.E. 35] (Feb. 3, 2000). I

view "the record in its entirely and take[ ] into account ... evidence unfavorable to the agency's decision." *Omnipoint Corp. v. Zoning Hearing Board of Pine Grove Township*, 181 F.3d 403, 408 (3d Cir.1999). A local board is not required to make specific findings of fact in order to support its decision, as long as competent substantial evidence support its ruling. *See Board of County Commissioners of Brevard County v. Snyder*, 627 So.2d 469, 476 (Fla. 1993).

■ The parties do not dispute that the Telecommunications Act bars the denial of a siting request based on the environmental effects of such a siting. Nor do they dispute the applicability and articulation of the relevant standards and zoning mandates. The dispute focuses on the question of whether or not the County's decision is supported by substantial evidence.

Boiled down to its essence, BellSouth's argument is that the County's decision was predicated upon the suspected health concerns articulated by the neighborhood residents. Counsel for BellSouth conceded, however, that if other substantial evidence in the record supports the decision, then the fact that irrelevant evidence in the record was presented does not change the conclusion. *See* Transcript of Oral Argument (Feb. 23, 2000). *See also Oyster Bay*, 166 F.3d at 495 (noting that the TCA is not violated by raising health concerns as long as the denial of a permit is based on substantial evidence of some legitimate reason).

## IV. FLORIDA ZONING LAW

Under Florida law, review of an administrative zoning decision entails a two-step process.[3] First, the applicant has the ini-

---

disagree. The majority of courts interpreting the contours of "substantial evidence" in the context of the Telecommunications Act hold that the standard is the same traditional standard utilized for review of agency decisions. *See generally OPM—USA—Inc. v. County of Marion*, 1999 WL 1427699, at *13 n. 19 (M.D.Fla.1999) (collecting cases). *See also AT & T Wireless PCS, Inc. v. City of Atlanta*, 210 F.3d 1322, 1326 n. 5 (11th Cir.2000) ("District courts interpreting the TCA have held that the phrase 'substantial evidence contained in a written record' is the traditional standard used for judicial review of agency actions. Additionally, the Supreme Court defines 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' ") (citations omitted), *vacated by* 223 F.3d 1324 (11th Cir.2000) (prior opinion vacated for lack of jurisdiction because the district court never entered final judgment).

3. Under Florida law, review of a board's action on a zoning application depends on the nature of the board's underlying action. "Whether a board's zoning decision is considered legislative or quasi-judicial turns on whether the local governmental body is enacting an ordinance, in which case it is acting legislatively, or enforcing it, in which case it may be acting quasi-judicially." *Hirt v. Polk*

*County Board of County Commissioners*, 578 So.2d 415, 417 (Fla. 2d DCA 1991). Stated differently, "legislative action results in the *formulation* of a general rule of policy, whereas judicial action results in the *application* of a general rule of policy." *Board of County Commissioners of Brevard County v. Snyder*, 627 So.2d 469, 474 (Fla.1993). The decision of a board sitting in a legislative capacity is reviewed under the "fairly debatable" standard. *See Nance v. Town of Indialantic*, 419 So.2d 1041, 1041 (Fla.1982). On the other hand, a board sitting in a quasi-judicial or administrative capacity is subject to oversight under the "substantial competent evidence" standard. *See Snyder*, 627 So.2d 469, 474 (Fla.1993). The definition of "substantial competent evidence" under Florida law is consistent with its definition under federal law. *Compare Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (defining "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"), *with De Groot v. Sheffield*, 95 So.2d 912, 916 (Fla.1957) (same). In this case, the parties do not dispute that the board was sitting in a quasi-judicial capacity, and hence, the issue is whether the board had before it substantial competent evidence to support the denial of the application. In any

tial "burden of proving that the proposal is consistent with the comprehensive plan and complies with all procedural requirements of the zoning ordinance." *Snyder,* 627 So.2d at 475. Then, the burden shifts to the governmental board to demonstrate that the denial of the application "accomplishes a legitimate public purpose." *Id.* Specific findings of fact are not required, but the board has the burden of showing that its denial of the zoning request was not arbitrary, discriminatory, or unreasonable, and was supported by substantial competent evidence. *See id.* at 476. *See also Florida Power & Light Co. v. City of Dania,* 761 So.2d 1089, 1092 (Fla.2000) ("In order for the agency to deny a permitted special exception application, the party opposing the application ... must show by substantial evidence that the proposed exception does not meet the published criteria.").

The operative question in this case is whether the board's decision was based on substantial competent evidence. Yet, concluding that the board's decision is reviewed under a "substantial competent evidence" standard merely begs the question of what types of evidence can constitute "substantial competent evidence." The Florida courts recognize that under certain circumstances, lay opinion testimony can establish substantial competent evidence. Indeed, "citizen testimony in a zoning matter is perfectly permissible and constitutes substantial competent evidence, so long as it is fact-based." *Miami–Dade County v. Walberg,* 739 So.2d 115, 117 (Fla. 3d DCA 1999) (citation and internal quotation marks omitted). On the other hand,

"mere generalized statements of opposition are to be disregarded, but fact-based testimony is not." *Id.* Lay individuals have been found to be just as competent as expert to proffer views on aesthetics, but have been found not as qualified as experts to testify about zoning trends. *Compare Board of County Commissioners of Pinellas County v. City of Clearwater,* 440 So.2d 497, 499 (Fla. 2d DCA 1983) ("The local, lay individuals with first-hand knowledge of the vicinity who were heard in opposition at the two public hearings were as qualified as 'expert witnesses' to offer views on the ethereal, factual matter of whether the City's proposed [project] would materially impair the natural beauty and recreational advantages of the area."), *with Metropolitan Dade County v. Blumenthal,* 675 So.2d 598, 601 (Fla. 3d DCA 1995) ("But lay persons are not just as qualified as expert witnesses to offer their conclusions or predictions as to zoning trends."). Finally, although the parties have not presented any caselaw to suggest that citizens appearing before a zoning board must be sworn in and subject to cross examination, some Florida caselaw suggests that the competency of evidence is impacted by observing such formalities. *Compare City of St. Petersburg v. Cardinal Industries Development Corp.,* 493 So.2d 535, 538 (Fla. 2d DCA 1986) ("We know of no requirement that witnesses appearing before the applicable boards in special exception proceedings must be sworn, and in the instant case [the petitioner] never sought to cross-examine the witnesses who did appear."), *with City of Apopka v. Orange County,* 299 So.2d 657,

event, the Florida courts have noted that the two standards—"substantial competent evidence" and "fairly debatable"—are functionally equivalent. *See Smith v. City of West Palm Beach,* 756 So.2d 166, 167 (Fla. 4th DCA 2000) (noting that the "fairly debatable" and "substantial competent evidence" standards both inquire into whether a "reason-

able mind would accept [such evidence] to support a conclusion.") (citations omitted). *See also Metropolitan Dade County v. Fuller,* 515 So.2d 1312, 1314 n. 4 (Fla. 3d DCA 1987) ("[T]he[ ] ['fairly debatable' and 'substantial evidence'] formulations are really expressions of the same general principle in different contexts.").

660 (Fla. 4th DCA 1974) ("The evidence in opposition to the request for exception was in the main laymen's opinions unsubstantiated by any competent facts. Witnesses were not sworn and cross-examination was specifically prohibited.").

Armed with this guidance from the Florida courts, I proceed to determine whether the board had before it substantial competent evidence to support the denial of BellSouth's application. It is undisputed that the residents did not present any expert testimony in opposition to BellSouth's application. The residents, however, were sworn in and subject to cross examination. The question, then, is whether the opposition of the residents was fact-based, and if so, whether a reasonable mind could conclude that such testimony would be sufficient for denying the application. My function here is not to re-weigh the evidence, but rather to assess whether the board had before it substantial competent evidence under which a reasonable mind could make a decision. *See Cardinal Industries Development Corp.*, 493 So.2d at 538 ("Where the evidence is conflicting, the courts should not interfere with an administrative decision to deny a special exception.").

In this case, the County assumes that BellSouth has shown that the proposed application is consistent with the comprehensive plan, but argues that BellSouth failed to meet its burden of showing a "necessity" for the proposed facility. Cross–Motion for Summary Judgment at 7 [D.E. 35] (Feb. 3, 2000). *See also Walberg*, 739 So.2d at 117 ("[A] property owner is not entitled to relief by proving consistency alone when the board action is also consistent with the comprehensive zoning plan."). The County also contends that the board's denial of the application based on incompatibility was not arbitrary and is supported by "substantial compe-

tent evidence." Cross–Motion for Summary Judgment at 11.

## A. NECESSITY

BellSouth submitted a map which showed that it had established approximately one hundred facilities in the County, including four facilities within two miles of the proposed site. *See* Cross–Motion for Summary Judgment at Exh.3. BellSouth conceded that the proposed facility was necessary only to serve overflow cell phone traffic for people making calls around Pro Player Stadium, particularly during gametime:

There are two reasons we want the site, here. Number one is the traffic reason. We have sites around Pro Player Stadium and we have a site that's at Golden Glades. Those sites are overflowing with traffic because of the Turnpike going through there and Miami Gardens Drive. And, this site would off-load those two sites, the one in the southeast and the one to the northwest.

That's what happens if you drive down that road and you try to make a phone call and you get a fast busy. That's because there's so many customers on your cell site that you're not able to process that call... We're having a lot of blocking, especially when there is a Marlin's game or a football game... There's a lot of traffic and we're not able to meet that need. And because the area we want to improve is to the northwest, there's a small area there that has marginal to below marginal coverage, there, and we won't be able to improve our coverage. We want to make sure that no matter where you go, you can make a call.

Deposition of Joseph Ward at 37–38 (Jan. 12, 2000), Cross–Motion for Summary Judgment at Exh. 4; Transcript of Board Hearing at 14–15 (June 11, 1998), Motion

for Partial Summary Judgment at Exh. A. The County also refers to hearing testimony by residents that the proposed facility was not needed in their community. *See, e.g.,* Motion for Partial Summary Judgment at Exh. B, pp. 8, 12.

BellSouth counters that the County imprudently declined to follow the recommendations of the County's professional staff, which recommended that the unusual use be granted. Yet, under Florida law, it is well settled that such staff recommendations are just that—recommendations. The ultimate decision whether or not to adopt those recommendations and grant the exception lies with the Board. *See Dade County v. Epstein,* 181 So.2d 556, 558 (Fla. 3d DCA 1965) ("[T]he decision of the zoning board of appeals ... constituted a recommendation to the board of county commissioners which it was empowered to approve or disapprove, as a final action thereon.") (citing § 33–311, *et seq.,* of the MIAMI-DADE COUNTY CODE); *Dade County v. United Resources, Inc.,* 374 So.2d 1046, 1050 (Fla. 3d DCA 1979) ("Th[e] recommendation [of the professional staff] was part of the record before the Commission and is probative, though not determinative, to support the application of the fairly debatable rule.").

In light of the foregoing evidence, the County argues that BellSouth failed to meet its burden of showing that the proposed facility was necessary, as contemplated by the County Code. Alternatively, the County argues that if BellSouth did meet its burden, then the testimony of several residents and the admissions made by BellSouth itself constitute substantial competent evidence for a reasonable mind to conclude that the proposed facility was not necessary in relation to the present and future development of the concerned area. I agree with both of the County's contentions. Viewing the record as a whole, including the admissions by BellSouth regarding the reason for the facility,

the neighbors' testimony, and the site maps that were submitted, BellSouth did not meet its burden of showing that the proposed use was necessary. *See Board of County Commissioners of Dade County v. First Free Will Baptist Church,* 374 So.2d 1055, 1056 (Fla. 3d DCA 1979) (noting that an unusual use applicant bears the burden of establishing the criteria under § 33–311 of the MIAMI-DADE COUNTY CODE). To the extend that BellSouth met its burden, the evidence was sufficient to permit a reasonable mind to conclude that the proposed facility was not necessary in light of the present and future development of the concerned area. *See Walberg,* 739 So.2d at 118 (upholding the county commission's denial of a rezoning application based on lay testimony, expert testimony, and a site map). The board's decision was supported by substantial competent evidence, and must be affirmed.

## B. COMPATIBILITY

The County Code expressly recognizes that compatibility is to be taken into account in determining whether an unusual use variance should be granted. *See* MIAMI-DADE COUNTY CODE § 33–311(A). Florida law permits an incompatibility finding to be based on aesthetics. *See Board of County Commissioners of Pinellas County,* 440 So.2d at 499. Upon review of the record and the relevant caselaw, I find that the lay testimony before the board was sufficient to allow a reasonable mind to conclude that proposed site would be incompatible with the surrounding residential area. In other words, the board's decision was supported by substantial evidence and will not be disturbed.

The board had before it the testimony of numerous residents who expressed their opposition to the proposed facility on the basis of aesthetics, property value concerns, and some impermissible consider-

ations. *See AT & T Wireless Services of Florida, Inc. v. Orange County,* 23 F.Supp.2d 1355, 1362 (M.D.Fla.1998) ("The only objection a Board may have to allowing a 99 foot tall [monopole] in the middle of a residential neighborhood may be aesthetics and property values, nonetheless, few would question a zoning department's denial of the same."). Although BellSouth parses the record to underscore the references to impermissible considerations, namely health and environmental concerns, *see* Notice of Filing [D.E. 45] (Feb. 29, 2000), it is not surprising that private citizens will have a more difficult time comprehending and accepting the fact that under the Telecommunications Act, environmental and health effects are not to be considered in the zoning calculus. The important point is that the board was eminently aware of the distinction between permissible and impermissible considerations. *See, e.g.,* Motion for Partial Summary Judgment at Exh. D, p. 26. Thus, the County's denial of the application expressly relied on compatibility concerns and failure to comply with the applicable zoning requirements (i.e., necessity). *See Blumenthal,* 675 So.2d at 604 ("It is axiomatic that the County Commission speaks through its written Resolution."). As noted earlier, BellSouth conceded that if other substantial evidence in the record supports the decision, then the fact that irrelevant evidence was presented is unavailing. *See* Transcript of Oral Argument (Feb. 23, 2000). *See also Oyster Bay,* 166 F.3d at 495.

Several residents and board members expressed opposition to the proposed monopole because the facility would be aesthetically displeasing. *See, e.g.,* Motion for Partial Summary Judgment at Exh. A, p. 33; *Id.* at Exh. D, pp. 23, 28–31, 33–34. They were opposed to both the aesthetic impact of the proposed facility itself, and the cumulative impact that the facility would have in the context of the existing

poles in the area. In addition, the board had before it approximately 198 other protests on file. *See* Motion for Partial Summary Judgment at Exh. C, p. 3. *See Metropolitan Dade County v. Section 11 Property Corp.,* 719 So.2d 1204, 1205 (Fla. 3d DCA 1998) (upholding denial of special exception permit based on lay testimony that the proposed project's "industrial" characteristics were incompatible with the surrounding residential neighborhood).

BellSouth responds by arguing that it went to great lengths to make the proposed monopole aesthetically compatible. Furthermore, BellSouth characterizes the area as "[a] deteriorating shopping center and small office building ... upon which numerous light and utility poles are located." Motion for Partial Summary Judgment at 18.

Upon review of the record, I find that the residents and board members had "first-hand knowledge of the vicinity [and were] ... as qualified as 'expert witnesses' to offer views" on the aesthetic incompatibility of the proposed monopole with the surrounding residential area. *Board of County Commissioners of Pinellas County,* 440 So.2d at 499. Indeed, the opponents' testimony regarding the aesthetic impact is particularly significant in light of the fact that some of the surrounding properties are occupied by single family residences. *See AT & T Wireless Services of Florida, Inc.,* 23 F.Supp.2d at 1362 ("[T]he Board reviewed the residential character of the neighborhood, the size of the structure and the proximity of the structure to single family residences, and made a determination that the use was not compatible with surrounding uses."). Moreover, the cumulative impact of pole overcrowding is certainly a valid aesthetic consideration, and is expressly noted in the County Code as such. *See* MIAMI-DADE COUNTY CODE § 33–311(A) ("The Communi-

ty Zoning Appeals Boards are advised that the purpose of zoning and regulations is ... to prevent the overcrowding of land and water ... with the view of giving reasonable consideration ... to the character of the district or area and its peculiar suitability for particular uses and with a view to conserving the value of buildings and property."), Motion for Partial Summary Judgment at Exh Q. *See also Cellular Telephone Co. v. Zoning Board of Adjustment of the Borough of Harrington Park*, 90 F.Supp.2d 557, 572 (D.N.J.2000) (upholding the denial of a permit for a telecommunications monopole based in part on the fact that the subject property "was already over utilized"); *Airtouch Cellular v. City of El Cajon*, 83 F.Supp.2d 1158, 1165 (S.D.Cal.2000) (upholding city's denial of a permit to erect telecommunications antennas based in part on the resident's personal observations on visual blight). *Cf. Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 647 (2d Cir.1999) (noting that a zoning authority may consider the "cumulative impact of separate applications within the same geographic area") (internal quotation marks omitted); *Riverside Roof Truss, Inc. v. Board of Zoning Appeals of the City of Palatka*, 734 So.2d 1139, 1142 (Fla. 5th DCA 1999) (holding that a variance need not be granted simply because other providers were operating in the area).

Federal caselaw interpreting the contours of the Telecommunications Act is understandably inconsistent because siting decisions are governed by the various and varied laws of the states, counties, and municipalities in question. Nevertheless, my decision here is consistent with other federal cases upholding the denials of siting requests. Courts which have upheld denials of siting requests based on the residents' opposition have found that aesthetic objections were based on sufficient factual predicates. *See, e.g., Airtouch Cellular*, 83 F.Supp.2d at 1165 (up-

holding the denial of a siting request based on residents' concerns about aesthetics, supported by photographs, reports, a petition signed by 212 opponents, and the residents' experiences with regard to noise and visual blight caused by prior monopole projects); *BellSouth Mobility, Inc. v. Parish of Plaquemines*, 40 F.Supp.2d 372, 379 (E.D.La.1999) (upholding the denial of two special use permits to build two cellular phone towers based in part on resident letters, petitions, and testimony regarding the aesthetic damage the cellular tower would have on the residential character of the area); *AT & T Wireless Services of Florida, Inc.*, 23 F.Supp.2d at 1356 (upholding the denial of an application to "construct a 135–foot steeple with concealed cellular antenna and [an] equipment station on the property of a church in a residential neighborhood," because "the Board reviewed the residential character of the neighborhood, the size of the structure and the proximity of the structure to single family residences, and made a determination that the use was not compatible with surrounding uses."). *See also id.* at 1362. ("Camouflaging the tower does nothing to decrease its mass, height or distance to the nearest residence."). *Cf. Cellular Telephone Co.*, 90 F.Supp.2d at 568 (upholding the denial of an application to build a 100 foot monopole based in part on uncontradicted evidence that the particular property, which was occupied by a two story dwelling used for both residential and commercial purposes, a separate building used for commercial purposes, storage containers, and parked trucks and equipment, "was already over utilized").

On the other hand, courts that have found resident opposition to constitute "mere generalized concerns" did so because of insufficient factual bases. *See, e.g., BellSouth Mobility, Inc. v. Gwinnett County*, 944 F.Supp. 923, 926 (N.D.Ga. 1996) (holding that the board's denial of a

zoning permit to construct a monopole was not supported by substantial evidence; the only record evidence in opposition was a resident's five minute testimony that the proposed monopole would pose a safety threat to children who might try to climb it, that the monopole would topple over in a storm, and that at least twenty homeowners could see the proposed site from their front windows); *Group EMF, Inc. v. Coweta County,* 50 F.Supp.2d 1338, 1347–50 (N.D.Ga.1999) (holding that denial of application for a 150 foot monopole was not supported by substantial evidence where safety engineers rebutted resident concerns that the pole would fall on a residential structure, where the zoning ordinance did not require a showing that no other sites were available, and where safety experts concluded that the pole, which would be located approximately 5,000 feet away from the runway of a local airport, would not pose a safety concern); *AT & T Wireless PCS, Inc. v. City of Chamblee,* 10 F.Supp.2d 1326, 1331–34 (N.D.Ga.1997) (holding that the denial of an application for a 140 foot communications tower was not supported by substantial evidence because the applicant plainly met the height requirements implicated by virtue of a nearby airport, and that the generalized concerns of a few citizens that the tower would interfere with helicopter traffic were speculative).

In this case, the opposition by the residents constitutes more than "mere generalized concerns." The proposed 90–foot structure would be significantly taller (approximately 28–38% taller) than existing poles surrounding the property, which BellSouth estimated to be about 65 to 70 feet in height.[4] *See* Motion for Partial Summary Judgment at 11; *Id.* at Exh. X.

*See also Aegerter,* 174 F.3d at 890 (upholding the denial of a siting request to replace existing telecommunications tower with a larger one based in part on the finding that the "proposed tower [was] significantly different from the utility poles and easements that are permitted" in the area). It is also undisputed that some of the surrounding plots are occupied by single family residences. *See* Motion for Partial Summary Judgment at Exh. R. Moreover, BellSouth conceded that the area is "deteriorating" and that numerous light and utility poles already occupy the landscape. *See id.* at 18. Accordingly, the opposition by the residents has a sound basis in fact. In light of BellSouth's concessions regarding the state of the property, the residents' fact-based testimony regarding aesthetic incompatibility, the site map, the photographs, and other record evidence, the County had before it sufficient evidence to permit a reasonable mind to conclude that the proposed facility was aesthetically incompatible with the surrounding area. *See Section 11 Property Corp.,* 719 So.2d at 1205 ("This fact based testimony regarding the aesthetic incompatibility of the project with the surrounding neighborhood, coupled with the site plan, elevation drawings, and the aerial photograph, constituted substantial competent evidence supporting the denial of the exception."); *Metropolitan Dade County v. Sportacres Development Group, Inc.,* 698 So.2d 281, 282 (Fla. 3d DCA 1997) (upholding county commission's denial of unusual use variance based on a record containing maps, reports, and other information, in conjunction with lay testimony that the proposed development would be incompatible with the surrounding community); *Walberg,* 739 So.2d at 118 (upholding the county

---

**4.** The record is unclear how high some of the surrounding poles stand. BellSouth contends that other poles in the neighborhood run from 65 to 80 feet high. *See* Motion for Partial Summary Judgment at 9–10, 18. Based on this estimate, the proposed monopole would be approximately 12–38% taller than the existing poles in the area.

**1358**

commission's denial of a rezoning application based on lay testimony, expert testimony, and a site map). *Cf. AT & T Wireless PCS, Inc. v. City Council of the City of Virginia Beach,* 155 F.3d 423, 431 (4th Cir.1998) (noting that under Virginia law, the relevant zoning authority was acting in a legislative capacity: "[T]he repeated and widespread opposition of a majority of citizens of Virginia Beach ... amounts to far more than a 'mere scintilla' of evidence to persuade a reasonable mind to oppose the application.").

## IV. CONCLUSION

Based on the record evidence, the County's decision to deny BellSouth's application was based on substantial evidence, and hence must be affirmed. Although BellSouth has made a good argument as to why its application could have been approved, a reasonable mind could conclude that the proposed facility was neither necessary or aesthetically compatible with the surrounding area. Consequently, BellSouth's motion for partial summary judgment [D.E. 35] is DENIED, and Miami–Dade County's cross-motion for summary judgment [D.E. 38] is GRANTED. Judgment will be entered in favor of Miami–Dade County by separate order. Any pending motions are DENIED AS MOOT, and this case is CLOSED.