[No. B151086. Second Dist., Div. One. Aug. 20, 2002.]

CITY OF RANCHO PALOS VERDES et al., Plaintiffs and Respondents,
v.
MARK J. ABRAMS, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B. and II.C.

**COUNSEL**

Cheong, Denove, Rowell, Antablin & Bennett, Wilkie Cheong; and Chris D. Imlay for Defendant and Appellant.

Carol W. Lynch, City Attorney; Richards, Watson & Gershon, Gregory M. Kunert and T. Peter Pierce for Plaintiffs and Respondents.

**OPINION**

**MALLANO, J.**—The Federal Communications Commission (FCC) licensed an amateur radio operator to use certain frequencies for commercial purposes. The City of Rancho Palos Verdes, where the operator resides and his city-approved radio antennae are located, requires a radio operator to obtain a city permit for such usage. The city denied the permit.

Thereafter, upon application by the city, the trial court issued a permanent injunction, prohibiting the radio operator from using any frequencies commercially without the city permit. The operator contends that federal communications law preempts the injunction. We agree and reverse.

I

BACKGROUND

Mark Abrams lives in the city and is the owner and resident of a single-family home. The property is in a residential area, zoned "RS-1" for single-family structures, and is located near the peak of the Palos Verdes Peninsula.

Abrams is an amateur, or "ham," radio operator. He is licensed by the FCC in the amateur radio service, which is a noncommercial endeavor or hobby. As a group, amateur radio operators provide a valuable service to the public. They transmit information about emergency preparedness, national security, and disaster relief. Amateur radio has been credited, through the use of intercontinental communications, with enhancing international good-will. And much of the highly developed radio communication technology existing today is the result of advances and discoveries made by amateur radio enthusiasts.

Pursuant to FCC licensing, Abrams uses his antennae not only to pursue his own amateur interests but also to provide other amateur radio operators with "repeater" services, which maximize the range between two radio units by receiving the signal from the sending unit and then repeating, or relaying, it to the receiving unit. Absent repeater services, low-power operators would not be able to communicate with each other because of obstacles in the terrain. The high elevation of Abrams's property also benefits amateur radio operators located at low elevations by allowing Abrams to retransmit their signals over substantial distances. Abrams provides these services at no cost to other amateur operators.

In addition to his amateur radio interests, Abrams owns Mobile Relay Associates, a business that is licensed by the FCC to provide "commercial mobile radio services," also known as "personal wireless services." These services would be used, for example, by a business or government agency that dispatches vehicles. To be precise, Abrams is licensed by the FCC to provide, among other things, two-way radio communications from portable and mobile transceivers, using frequencies allocated by the FCC to commercial mobile radio services. He is licensed by the FCC to provide his customers with commercial repeater services, which perform the same function as the repeater services for amateur radio transmissions.

Abrams owns another business, Raycom, which sells and services two-way radio communications equipment. Abrams states that he does not

conduct any business out of his residence but uses an office in the City of Paramount for that purpose. Mobile Relay Associates and Raycom operate on a for-profit basis.

There are two antenna structures in Abrams's backyard. The main structure, a tower, was erected in 1990 after the city approved a "site plan review application." The city authorized a 40-foot tower consisting of a 30-foot support structure and a 10-foot retractable antenna mast. The city's building department subsequently approved plans for a higher structure. Upon completion, the tower had a 40-foot support structure and a retractable antenna mast of 12.5 feet. In approving the tower, the city prohibited its use for commercial purposes. Since 1998, the tower has been regularly maintained at a height of 52.5 feet.

The second antenna structure, a 40-foot, single-pole antenna, was installed in 1997. It was clamped to the fence surrounding a tennis court. Abrams did not know that city approval was required for this antenna. Upon learning that it was, he submitted a site plan review application, which the city approved. The approval did not preclude the antenna's use for commercial purposes. The pole antenna has always been maintained in the same configuration.

Since 1991, the FCC has issued at least 76 licenses to Abrams and his customers, permitting the use of his antennae for commercial purposes. For example, on October 5, 1993, Mobile Relay Associates, Abrams's company, was licensed to operate on 472.7375 MHz at his property. That frequency is allocated for commercial mobile radio services. To take another example, one of Abrams's customers, FCI 900, Inc., has been licensed by the FCC since April 17, 1996, to operate on 938.550 MHz at his property. That frequency, too, is dedicated to commercial mobile radio services.

Abrams asserts that he never used the two city-approved antenna structures to receive or transmit on frequencies for commercial use. Instead, he bought and used portable antennae mounted on tripods, which he put in the backyard. He also used a mobile tower trailer, which he parked in his side yard.

Under the city's "antenna ordinance," an FCC licensee is required to obtain a conditional use permit from the city's planning commission to operate commercially. The ordinance defines "commercial antenna" as "all antennas, parabolic dishes, relay towers and antenna support structures used for the transmission or reception of radio, television and communication signals for commercial purposes." (Rancho Palos Verdes Mun. Code, § 17.96.090.) "Commercial purposes," in turn, means "communications for

hire or material compensation, or the use of commercial frequencies, as these terms are defined by the [FCC]." (*Ibid.*)

The permit process requires the applicant to submit substantial documentation to the planning commission concerning a number of factors, including the height and design of the tower, power output, evidence of structural integrity, and information about the location of the tower, landscaping, and antenna arrays. (See Rancho Palos Verdes Mun. Code, § 17.76.020, subd. (A)(11).) The planning commission conducts a noticed public hearing on the matter and receives evidence. In reviewing a permit application, the commission considers four factors, specifically, the need to (1) minimize visual impacts of antenna towers, (2) avoid damage to adjacent properties from tower failure, (3) maximize the use of existing towers in order to minimize the construction of new ones, and (4) ensure that antennae are compatible with adjacent uses. (Rancho Palos Verdes Mun. Code, § 17.76.020, subd. (A)(1).)

On several occasions in 1998 and 1999, the city monitored radio transmissions from Abrams's property and detected the commercial use of frequencies. Presumably, the transmissions were carried on Abrams's portable tripod antennae or the mobile tower trailer, not the city-approved antennae. Abrams did not know that the city required a permit to operate commercially.

On April 12, 1999, the city and the State of California (collectively the city) filed this action, seeking an injunction to bar Abrams from, among other things, operating for commercial purposes without a city permit.[1] In response, Abrams answered the complaint and filed a cross-complaint, alleging that the city's permit requirement was preempted because it prohibited the use of frequencies allocated to him and his customers by the FCC.

During the proceedings below, the trial court suggested that the dispute might be resolved if Abrams applied for a city permit to operate commercially. He did so. The planning commission held a public hearing and denied the permit. Abrams appealed to the city council, which affirmed the commission's decision.

In the trial court, Abrams filed a motion for summary adjudication based on his preemption theory. The city filed opposition. The trial court denied the motion.

On September 13, 1999, the trial court granted the city's motion for a preliminary injunction. The case was later tried on stipulated facts. On May

---

[1]Cheryl A. Abrams was also named as a defendant. It appears that she never participated in the litigation. She is not a party to this appeal.

24, 2001, the trial court entered judgment in the city's favor, issuing a permanent injunction containing the prohibitions requested in the city's complaint. Abrams filed a timely appeal from the judgment.

Meanwhile, after the city denied Abrams's permit, he filed an action against the city in federal court (*Abrams v. City of Rancho Palos Verdes* (U.S. Dist. Ct., C.D.Cal., 2000, No. 00-09071-SVW), alleging a violation of the Telecommunications Act of 1996 (Pub.L. No. 104-104, § 704(a) (Feb. 8, 1996) 110 Stat. 56, 151-152) (codified at 47 U.S.C. § 332(c)(7)). The federal district court granted Abrams's petition to vacate the city's denial of the permit, finding that the city's decision was not supported by substantial evidence that Abrams's commercial use of frequencies would cause adverse effects. (See 47 U.S.C. § 332(c)(7)(B)(iii) [decision of municipality denying "a request to place, construct, or modify [commercial mobile radio] service facilities shall be in writing and supported by substantial evidence contained in a written record"].) The city has filed an appeal to the Ninth Circuit Court of Appeals.

## II

### DISCUSSION

■ Because this appeal involves the application of statutes and the city's antenna ordinance to undisputed facts, we review the trial court's decision de novo. (See *In re Marriage of Armato* (2001) 88 Cal.App.4th 1030, 1034 [106 Cal.Rptr.2d 395].)

The permanent injunction prohibits Abrams from (1) using any antenna for commercial purposes without a city permit, (2) erecting or constructing any antenna, temporary or otherwise, without city approval, and (3) violating any provision of the antenna ordinance or the city's municipal code. Abrams contests each of these provisions. We address them in turn.

### A. *Use of Antennae for Commercial Purposes*

■ Abrams contends that, in accordance with federal communications law, he has the right to use the existing city-approved antennae for commercial purposes and that the permanent injunction improperly forbids that use. The city has already granted Abrams a permit for *amateur* transmissions, and the FCC has approved Abrams's use of certain frequencies for *commercial* purposes. Each antenna can receive and transmit frequencies for amateur *and* commercial uses—through "diplexing"—without any new or different antennae. Nor will Abrams need additional equipment, such as air-conditioning

units or generators. And the height of the antenna structures will not change. All Abrams need do is install some repeater equipment inside his house and connect it to the antenna structures by means of existing transmission lines. Thus, the only change in Abrams's operation would be the commercial use of frequencies allocated and assigned by the FCC. Because the trial court's injunction prohibits that use, it is preempted by federal communications law, as we will discuss.

■ "The doctrine relating to the preemption of the law of one of the several states by that of the United States itself may be summarized as follows:

"Clause 2 of article VI of the United States Constitution—the supremacy clause—declares that 'Laws of the United States . . . shall be the supreme Law of the Land; and the [J]udges in every [S]tate shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' [¶] . . . [¶] Whether federal law preempts state law is fundamentally a question whether Congress has intended such a result. . . . [¶] The 'starting presumption' is that Congress has not so intended." (*Peatros v. Bank of America* (2000) 22 Cal.4th 147, 157 [91 Cal.Rptr.2d 659, 990 P.2d 539], citations omitted.)

■ "Preemption of state law by federal law is found in 'three circumstances.' . . . [¶] First, there is so-called 'express preemption': 'Congress can define explicitly the extent to which its enactments pre-empt state law.' . . . [¶] Second, there is so-called 'field preemption': '[S]tate law is preempted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.' . . . [¶] Third, there is so-called 'conflict preemption': '[S]tate law is pre-empted to the extent that it actually conflicts with federal law.' . . . Such conflict must be 'of substance and not merely trivial or insubstantial.' . . . It exists when it is 'impossible . . . to comply with both state and federal requirements' . . . or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' underlying federal law . . . . Although 'state law is pre-empted to the extent that it actually conflicts with federal law' . . . , it is preempted only to that extent and no further . . . ." (*Peatros v. Bank of America, supra*, 22 Cal.4th at pp. 157-158, citations omitted.)

"The 'three circumstances' in which preemption of state law by federal law is found should not be understood to be 'rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.'" (*Peatros v. Bank of America, supra*, 22 Cal.4th at p. 158, fn. 1.)

█ We conclude that the trial court's injunction is preempted because it conflicts with the licenses granted by the FCC (conflict preemption) and because Congress intended the FCC, not local authorities, to determine the frequencies that a radio operator may use (field preemption).

The federal Communications Act of 1934 (Pub.L. No. 73-416 (June 19, 1934) 48 Stat. 1064) (codified as amended at 47 U.S.C. § 151 et seq.) (hereafter FCA) was intended "to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority . . . ." (47 U.S.C. § 301.) "The Act created the FCC and empower[ed] it to regulate radio communications including 'technical and engineering aspects.' " (*Southwestern Bell v. Johnson County Bd.* (10th Cir. 1999) 199 F.3d 1185, 1190.)

█ "The Commission was expected to serve as the 'single Government agency' with 'unified jurisdiction' and 'regulatory power over all forms of electrical communication, whether by telephone, telegraph, cable, or radio.' It was for this purpose given 'broad authority.' . . . [T]he Act's terms, purposes, and history all indicate that Congress 'formulated a unified and comprehensive regulatory system for the [broadcasting] industry.' " (*U.S. v. Southwestern Cable Co.* (1968) 392 U.S. 157, 167-168 [88 S.Ct. 1994, 2000, 20 L.Ed.2d 1001], fns. omitted.)

█ Under the FCA, a person operating as an amateur enthusiast, as a for-profit business, or both is considered a "licensee" operating a "station." (47 U.S.C. § 153(2), (24), (27).) By statute, the FCC is authorized to (1) "Classify radio stations," (2) "Prescribe the nature of the service to be rendered by each class of licensed stations and *each station within any class*," (3) "Assign bands of frequencies to the various classes of stations, and *assign frequencies for each individual station* and determine the power which each station shall use and the time during which it may operate," (4) "*Determine the location of . . . individual stations*," and (5) "Have authority to establish areas or zones to be served by *any station*." (47 U.S.C. 303(a)-(d), (h), italics added.)

Congress has limited the FCC's authority over frequencies in one important respect: "[*C*]*hanges in the frequencies*, authorized power, or in the times of operation of any station, *shall not be made without the consent of the station licensee* unless the Commission shall determine that such changes will promote public convenience or interest or will serve public necessity, or the provisions of this [statute] will be more fully complied with . . . ." (47 U.S.C. § 303(f), italics added.)

"In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the [FCC] shall make such *distribution of licenses, frequencies,* hours of operation, and of power *among the several States and communities* as to provide a fair, efficient, and equitable distribution of radio service to each of the same." (47 U.S.C. § 307(b), italics added.)

"[T]he FCC can limit transmissions to certain frequencies according to the purpose and nature of the transmission, as well as according to the technique of transmission, so that the most beneficial use of the frequency can be made." (*Gross v. F.C.C.* (2d Cir. 1973) 480 F.2d 1288, 1292, fn. 7.) The FCC's authority extends to " 'the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services . . . incidental to such transmission.' " (*Telecommunications Research & Action Ctr. v. F.C.C.* (D.C. Cir. 1986) 801 F.2d 501, 514, italics omitted, quoting 47 U.S.C. former § 153(b) [now § 153(33)].)

Given the FCC's statutory authority over frequencies, the United States Supreme Court has stated that "the Commission's jurisdiction over technical matters *such as frequency allocation . . . is clearly exclusive.*" (*Head v. New Mexico Board* (1963) 374 U.S. 424, 430, fn. 6 [83 S.Ct. 1759, 1763, 10 L.Ed.2d 983], italics added; accord, *Southwestern Bell v. Board of County Com'rs* (D.Kan. 1998) 17 F.Supp.2d 1221, 1225, affd. (10th Cir. 1999) 199 F.3d 1185.) "The[] statutory provisions make it clear that Congress intended the FCC to possess exclusive authority over technical matters related to radio broadcasting." (*Freeman v. Burlington Broadcasters, Inc.* (2d Cir. 2000) 204 F.3d 311, 320.)

Here, the city argues that Abrams should not be allowed to "convert" his amateur radio operation to commercial use. As set forth in the city's brief: "Converting [Abrams's] existing antenna facilities to commercial use is no less than constructing a new tower from the ground up, because the change in use triggers a change in what is required by [city] law to permit the structure. . . . [A] permit to construct a house in a residential zone does not authorize using the house as a saloon or gaming hall merely because the structure and external appearance are not altered . . . ."

The city's hypothetical is inapt. Converting a house into a saloon or gaming hall would bring about a visual and demographic change in the neighborhood involving the comings and goings of drinkers and gamblers, whereas Abrams's commercial operation would do nothing of the sort.

The city initially approved Abrams's use of the antenna structures for amateur radio purposes. Later, the FCC licensed Abrams to operate commercially on certain frequencies. Yet, when Abrams filed a permit application,

the city denied the permit, preventing him from using the FCC-approved frequencies. The trial court's injunction had the same effect. Thus, the injunction " 'stands as an obstacle to[, and in conflict with,] the accomplishment and execution of the full purposes and objectives' underlying [the authority of the FCC to allocate radio frequencies]." (*Peatros v. Bank of America, supra*, 22 Cal.4th at p. 158.)

██ ██ Further, the FCC has exclusive authority in the field of allocating radio frequencies. "The fundamental rationale for the Communications Act of 1934 . . . is based on the fact that the number of available radio frequencies is finite, and therefore, Congress must exercise its power over interstate commerce to allocate available frequencies and control their use. . . . Unquestionably, federal legislation has preempted local regulation of radio transmission, including *assignment of frequencies*" (*Schroeder v. Municipal Court* (1977) 73 Cal.App.3d 841, 846 [141 Cal.Rptr. 85], citations omitted, italics added), foreclosing municipal regulation in that area. In short, the trial court's injunction in this case gives rise to conflict and field preemption.

The city expresses concern that allowing Abrams to operate commercially will set a precedent for other amateur radio operators to do the same thing. We note that the FCC must first approve an operator's application to use frequencies for commercial purposes. In that regard, the FCC is statutorily required to "provide a fair, efficient, and equitable distribution of radio service to each [community]." (47 U.S.C. § 307(b).) That the FCC has granted Abrams and his customers licenses over a span of several years does not mean that the commission will approve every application that comes before it.

The FCC must also take care to avoid a commercial use that would interfere with the reception of radio waves by others, for example, by interfering with the operation of nearby televisions, telephones, stereo equipment, or recording devices. (See *Broyde v. Gotham Tower, Inc.* (6th Cir. 1994) 13 F.3d 994.) An application for an FCC license, or renewal of a license, can be opposed on grounds of radio frequency interference. (See *id.* at p. 998.) And if a license has already been issued, and the licensee causes interference, the license can be challenged administratively and, failing that, in court. (See *ibid.*)

In addition, the city retains zoning authority, albeit somewhat limited, as to the placement, construction, and modification of facilities used for commercial mobile radio services, including antennae, under the Telecommunications Act of 1996 (hereafter TCA). ██ Congress intended the

TCA " 'to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.' . . . [T]he purpose of the Telecommunications Act is 'to provide for a pro-competitive, deregulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition[.]' " (*360° Communications Co. v. Albemarle County* (4th Cir. 2000) 211 F.3d 79, 85-86.)

"Congress found that 'State and local requirements, siting and zoning decisions' had 'created an inconsistent and, at times, conflicting patchwork of requirements' that was 'inhibiting the deployment' of wireless communications services." (*Petersburg Cellular v. Board of Sup'rs of Nottaway* (4th Cir. 2000) 205 F.3d 688, 697.) But "[w]hile Congress sought to limit the ability of state and local governments to frustrate the Act's national purpose of facilitating the growth of wireless telecommunications, [it] also intended to preserve state and local control over the siting of towers and other facilities that provide wireless services. [Congress] struck a balance between the national interest in facilitating the growth of telecommunications and the local interest in making zoning decisions . . . . [A]uthority to regulate siting and construction of telecommunications towers is preserved in state and local governments, . . . but these decisions are subject to certain [statutory] limitations . . . ." (*360° Communications Co. v. Albemarle County, supra*, 211 F.3d at p. 86.)

Those limitations, as codified, provide in part: "Except as [set forth] in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of [commercial mobile radio] service facilities. [¶] . . . [¶] . . . The regulation of the placement, construction, and modification of [commercial mobile radio] service facilities by any State or local government or instrumentality thereof—[¶] (I) shall not unreasonably discriminate among providers of functionally equivalent services; and [¶] (II) shall not prohibit or have the effect of prohibiting the provision of [commercial mobile radio] services." (47 U.S.C. § 332(c)(7).)

■ "Congress . . . preserve[d] some local zoning authority over the placement of [commercial mobile radio service] transmitters . . . . However, . . . Congress did not intend . . . to repeal the FCC's exclusive jurisdiction over [frequency allocation]. The statute's preservation of local power extends only to 'placement, construction and modification' of 'facilities.' In light of the FCC's pervasive regulation of broadcasting technology,

this provision is most reasonably understood as permitting localities to exercise zoning power based on matters not directly regulated by the FCC." (*Freeman v. Burlington Broadcasters, Inc., supra*, 204 F.3d at p. 323.) As stated, the FCC directly and exclusively regulates the allocation of frequencies.

As required by city law, Abrams had to seek a city permit to operate commercially, as must other amateur radio operators who want to use frequencies for commercial purposes. We reject Abrams's assertion that, by virtue of an FCC license to operate commercially, he and other amateur radio operators do not have to apply for a city permit *at all*. Even if it appears that the city must, as a matter of federal law, allow commercial usage, an operator is still required to apply for a permit. Operators cannot declare themselves exempt from the city's antenna ordinance. The city has the right, consistent with federal law and in furtherance of the goals of the antenna ordinance, to grant or deny a permit for commercial use. (See, e.g., *American Tower L.P. v. City of Huntsville* (11th Cir. 2002) 295 F.3d 1203; *Amherst, N.H. v. Omnipoint Communications* (1st Cir. 1999) 173 F.3d 9; *AT&T Wireless PCS v. Winston-Salem Zoning Board* (4th Cir. 1999) 172 F.3d 307.) If the city denies a permit, an applicant can seek judicial relief, as Abrams has done by filing an action against the city.

Thus, under the TCA, if an amateur radio operator seeks to operate commercially, with or without continued amateur use, the city may deny a permit for a legitimate reason. (See, e.g., *360° Communications Co. v. Albemarle County, supra*, 211 F.3d 79 [county had authority to deny permit for construction of 100-foot tower where construction would disrupt natural balance of soil, slope, and vegetation in mountain area]; *Sprint Spectrum L.P. v. Willoth* (2d Cir. 1999) 176 F.3d 630 [upholding town's denial of request to construct three towers where construction would cause significant negative aesthetic impact]; *AT & T Wireless PCS v. City Council of Virginia Beach* (4th Cir. 1998) 155 F.3d 423 [county could deny permit to construct towers so as to preserve character of neighborhood and avoid aesthetic blight].)

In circumstances where the denial of a permit would violate the TCA, the situation may warrant the issuance of a permit subject to specified conditions. Courts have found a variety of conditions to be appropriate, such as using vegetation to eliminate blight (*Western PCS II v. Extraterritorial Zoning Auth.* (D.N.M. 1997) 957 F.Supp. 1230, 1237, 1240), painting an antenna tower in a color chosen by the adjacent property owners (*BellSouth Mobility, Inc. v. Gwinnett County* (N.D.Ga. 1996) 944 F.Supp. 923, 925, 928-929), preventing the lighting of an antenna tower (*ibid.*), limiting the size of an equipment building and requiring that it be made of brick (*APT

*Minneapolis, Inc. v. Stillwater Township* (D.Minn., Aug. 15, 2001, Civ. No. 00-2500 (JRT/FLN) 2001 WL 936193, *5 & fn. 6), and prohibiting the use of advertising and identification signs (*ibid.*).

According to at least one court, "[residents'] generalized concerns about aesthetics are insufficient to constitute substantial evidence upon which the [city] could rely [to deny a permit]. Aesthetic concerns may be a valid basis for denial of a permit *if* substantial evidence of the visual impact of the tower is before the [city]. . . . Mere generalized concerns regarding aesthetics, however, are insufficient to create substantial evidence justifying the denial of a permit under the [TCA]." (*Preferred Sites, LLC v. Troup County* (11th Cir. 2002) 296 F.3d 1210, 1219, italics in original; accord, *Omnipoint Corp. v. Zoning Hearing Bd.* (3d Cir. 1999) 181 F.3d 403, 409; cf. *Cellular Telephone Co. v. Town of Oyster Bay* (2d Cir. 1999) 166 F.3d 490, 495 ["Courts have split as to the weight to be afforded to constituent testimony on aesthetics . . . ."]; *BellSouth Mobility v. Miami-Dade County, Florida* (S.D.Fla. 2001) 153 F.Supp.2d 1345, 1356-1358 [contrasting cases].)

"In assessing the visual impact of [a] proposed tower, [a city is] entitled to make an aesthetic judgment about whether that impact [is] minimal, without justifying that judgment by reference to an economic or other quantifiable impact. [¶] Nonetheless, that aesthetic judgment must be grounded in the specifics of the case. Few people would argue that telecommunication towers are aesthetically pleasing. Some of the disapproving comments in the cases about generalized aesthetic concerns refer to negative comments that are applicable to any tower, regardless of location. . . . In other cases, the aesthetic objections were demonstrably without substance because of evidence that the towers and transmitters were either difficult to see or were aesthetically compatible with the character of the area." (*Southwestern Bell Mobile Systems, Inc. v. Todd* (1st Cir. 2001) 244 F.3d 51, 61 [citing cases].)

Putting aside the foregoing land use considerations, the city argues that Abrams's commercial operation constitutes a nuisance per se under the antenna ordinance and that proof of the ordinance's violation is sufficient to support the permanent injunction. (See *People ex rel. Dept. of Transportation v. Outdoor Media Group* (1993) 13 Cal.App.4th 1067, 1076 [17 Cal.Rptr.2d 19] [discussing nuisance per se].) On the contrary, given that the city's decision to deny Abrams a permit is preempted by federal communications law, his commercial operation is not enjoinable as a nuisance. (See *Freeman v. Burlington Broadcasters, Inc., supra*, 204 F.3d at p. 325 [nuisance claims barred].)

Further, even though the city's approval of the main tower structure in 1990 expressly prohibited commercial use, the city may not invoke that limitation now. The city cannot condition a permit on a preempted provision. Thus, the 1990 prohibition is of no effect. (See *Freeman v. Burlington Broadcasters, Inc.*, *supra*, 204 F.3d 311 [invalidating condition of permit that was preempted under federal communications law].)

■ Finally, the antenna ordinance requires that a radio operator obtain a city permit to use an antenna for "commercial purposes"—a term that Abrams attacks as being vague and overbroad. He also asserts that the antenna ordinance unduly restricts the use of radio airwaves, rendering it unconstitutional under the First Amendment to the United States Constitution. We disagree with both arguments.

The ordinance defines "commercial purposes" as "communications for hire or material compensation, or the use of commercial frequencies, as these terms are defined by the [FCC]." (Rancho Palos Verdes Mun. Code, § 17.96.090.) Consequently, if a radio operator uses one or more antennae to conduct a for-profit business, transmits on a frequency allocated by the FCC to commercial mobile radio services, *or* is paid by others for transmission services, a city permit is required. We see nothing vague or overbroad here.

Nor is there anything unconstitutional. In a case similar to this one, the defendants argued that they had a " 'constitutional right to freedom of expression over the public forum of the airwaves . . . [and] . . . access to unused and open broadcast frequencies for the purpose of disseminating their views to the public' . . . ." (*U.S. v. Weiner* (D.Mass. 1988) 701 F.Supp. 14, affd. mem. (1st Cir. 1989) 887 F.2d 259.) The court rejected that notion, stating: "The First Amendment does not grant anyone the right to broadcast by radio. The regulation by government of broadcasting by radio is constitutional. . . . [¶] Defendants have no unabridgeable First Amendment right to broadcast. . . . [¶] . . . [¶] The Federal Communications Commission must allocate what limited available broadcast frequencies exist by way of the licensing process. That type of regulation will best serve the public interest. . . . [T]he right of free speech does not include the right to broadcast without a license. The regulation of the radio band in question does not infringe upon [the] constitutional rights of the defendants." (*U.S. v. Weiner*, *supra*, 701 F.Supp. at pp. 16-17.)

■ In sum, the FCC licensed Abrams to use certain frequencies for commercial purposes. The city denied a permit for that use, treading upon an area preempted by federal communications law. The trial court's injunction was premised on the same error, requiring that we vacate the judgment.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### DISPOSITION

The "Judgment of Permanent Injunction" is vacated and the matter is remanded to the trial court for further proceedings consistent with this opinion. The parties are to bear their own costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied September 11, 2002, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied November 13, 2002.

---

*See footnote, *ante,* page 367.